CHAPIN FITZGERALD SULLIVAN LLP
  Edward D. Chapin, Esq. (SBN: 053287)
  Kenneth M. Fitzgerald, Esq. (SBN: 142505)
  Jill M. Sullivan, Esq. (SBN: 185757)
  Curtis Carll, Esq. (SBN: 248470)
  Douglas J. Brown, Esq. (SBN: 248673)
  Jennifer M. Chapman, Esq. (SBN: 253065)
550 West "C" Street, Suite 2000
San Diego, California 92101
Tel:  (619) 241-4810
Fax:  (619) 955-5318

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BETTY GUZMAN, on behalf of herself and all others similarly situated, | Case No.:  **'11 CV 69   W   BGS** |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR:** |
| vs. | 1. BREACH OF CONTRACT; |
| BRIDGEPOINT EDUCATION, INC., ASHFORD UNIVERSITY, and UNIVERSITY OF THE ROCKIES | 2. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING; |
| Defendants. | 3. VIOLATION OF BUS. & PROF. CODE § 17200; |
| | 4. VIOLATION OF BUS. & PROF. CODE § 17500; |
| | 5. VIOLATION OF THE CONSUMER LEGAL REMEDIES ACT; and |
| | 6. NEGLIGENT MISREPRESENTATION. |
| | **JURY TRIAL DEMANDED** |

1

CLASS ACTION COMPLAINT

## JURISICTION AND VENUE

1.     Jurisdiction is proper pursuant to 28 U.S.C. Section 1332(d)(2)(A), because this is a class action in which minimal diversity exists, and the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs.

2.     The amount in controversy, exclusive of interest and costs, exceeds the jurisdictional minimum of this Court.

3.     Venue is proper in this Court pursuant to 28 U.S.C. Section 1391(a)(2) because Defendant Bridgepoint Education, Inc. is headquartered and maintains its principal place of business in this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and Defendant Bridgepoint Education, Inc. has received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## NATURE OF THE ACTION

4.     Plaintiff brings this action as a class action on behalf of a nationwide class of plaintiffs (the "Class") composed of all persons who enrolled in and/or attended classes at either of the two academic institutions operated by Bridgepoint Education, Inc. ("Bridgepoint" or the "Company") – Ashford University ("Ashford") or University of the Rockies ("The Rockies") – during the period approximately from March 1, 2005 through the present (the "Class Period").

5.     Bridgepoint is a for-profit higher education company headquartered in San Diego, California.  The Company owns and operates two academic institutions, Ashford and The Rockies, which offer Associate, Bachelor's, Master's and Doctoral programs primarily online, although they also maintain physical campuses in Clinton, Iowa (Ashford) and Colorado Springs, Colorado (The Rockies).

6.     Bridgepoint engaged in a pattern of improper and unlawful conduct in order to recruit students and over-charge the federal government for federal financial aid throughout the Class Period.  The Defendants exploited Plaintiff and all members of the Class, through the use of standardized, misleading recruitment tactics, including the following:

CLASS ACTION COMPLAINT

(a)     Defendants hid federally required disclosures from prospective students on Defendants' websites, and required prospective students to enroll before gaining access to this information, in violation of Title IV of the Higher Education Act of 1965 ("Title IV") and the California Private Postsecondary Education Act of 2009;

(b)     Defendants misrepresented the true cost of attendance by falsely claiming that Ashford and The Rockies provide "some of the lowest cost tuition programs available," quoting to prospective students false and misleading tuition rates for degree programs, and failing to disclose substantial non-tuition costs such as administrative fees;

(c)     Defendants misrepresented the quality of academic instruction;

(d)     Defendants misrepresented The Rockies' accreditation with the American Psychological Association ("APA") and ability to qualify students to obtain professional psychology licensure;

(e)     Defendants misrepresented students' post-graduation employability and earnings potential.

7.     Defendants made these uniform material misrepresentations in three ways: 1) through standardized written materials (including on the schools' websites) that were available and/or given to all Class members, 2) through uniform scripted oral misrepresentations made by the schools' "enrollment advisors," and 3) through material omissions of information that Defendants had a duty to disclose, and on which Class members relied in deciding to enroll at Ashford or The Rockies.

8.     Students relied on these misrepresentations when deciding to enroll, because they were misled to believe that Defendants will provide a quality education at an affordable price, and that they will graduate with a degree that qualifies them for professional licensure and/or for high paying employment in their chosen profession. Instead, students pay some of the highest tuition rates in the country, are unwittingly placed in courses that are irrelevant to their stated concentration, receive low quality instruction from under-qualified teachers who, among other things, improperly award grades for assignments that have not

3

CLASS ACTION COMPLAINT

1    even been completed, and graduate with a degree that neither qualifies them to obtain the

2    professional licensing that Defendants led them to believe they would obtain nor qualifies them

3    for any job placement other than low-wage, low-skill employment.

4         9.      Defendants systematically make these misrepresentations to prospective and

5    enrolled students for one reason: to recruit and enroll as many students as possible in order to

6    profit as much as possible, regardless of the students' best interests.

7         10.     Defendants' exploitive purpose is achieved in part through Bridgepoint's

8    improper and unlawful practice of setting enrollment quotas for its enrollment advisors,

9    financially rewarding enrollment advisors who outperform these quotas, and disciplining and/or

10   terminating advisors who fail to reach these quotas. Defendants require enrollment advisors and

11   their supervisors to chart their enrollment efforts and track the number of students they enroll

12   and new referral leads they generate in each 6 month period.  Defendants then award advisors on

13   teams that enroll more students with prizes, cash bonuses and rapid promotion – in direct

14   violation of Title IV's prohibition against providing incentive-based compensation for meeting

15   enrollment quotas.  Defendants reprimand advisors on teams that enroll fewer students.

16   Advisors that enroll fewer students are, in many cases, terminated.  Managements' sole concern

17   throughout this process is to increase enrollment and retention numbers to serve the ultimate

18   goal of maximizing Bridgepoint's profits.  Defendant's policies and practices demonstrate that

19   providing accurate information to prospective students, honoring the desires of prospective

20   students, or working in these individuals' best interest is of "no concern at all."

21        11.     Bridgepoint enrollment advisors are familiar with the refrain that "applications

22   save your seat, retention gets you paid" and have been harshly disciplined or even terminated

23   when they fail to meet their quotas for enrolling prospective students.

24        12.     In addition to implementing deceptive tactics to induce prospective students into

25   enrolling, Defendants also misleadingly encourage students to apply for federal financial aid in

26   the form of student loans that Defendants knows students do not necessarily need nor

27   necessarily can repay.  These tactics include pressuring students to apply for the maximum

28   allowable amount of federal financial aid, even when it exceeds the cost of attendance, and

CLASS ACTION COMPLAINT

1  failing to disclose that students must begin repaying their loans immediately upon enrollment –
2  rather than upon completion of the degree, as is standard for federal student loans.

3      13.     Defendants also fail to inform prospective students of the material fact that their
4  Cohort Default Rates – the percentage of students who default on their students loans - are
5  significantly higher than average.  For example, Bridgepoint reported in its 2009 Form 10-K
6  filed with the U.S. Securities and Exchange Commission that the Cohort Default Rate for
7  Ashford in 2008 (the latest year for which data is available) was 13.3%, nearly double the
8  average student loan default rate of 7.0%.  The Department of Education projected an unofficial
9  Cohort Default Rate for Ashford as high as 17.4% for 2008, two and a half times the
10 nationwide average.  Defendants' omissions of Cohort Default Rates is material because high
11 student default rates are a leading indicator that graduates cannot repay their loans, whether
12 because their education did not adequately prepare or qualify them for employment, because
13 their degrees only allow them to secure low-wage jobs, or because their schools' tuition rates
14 are excessive in relation to the schools' value in helping graduates find gainful employment.

15     14.     Plaintiffs and the other members of the Class relied on these material
16 misrepresentations and omissions regarding federal financial aid when enrolling at Ashford or
17 The Rockies because they would not have enrolled had they known they would be responsible
18 for paying back more loans than necessary to finance their education, that they would be
19 responsible for immediately repaying their loans upon enrollment, and that Bridgepoint
20 students' federal loan default rate was twice the national average.

21     15.     Defendants pressure students to apply for the maximum available federal student
22 loan amount, even when Defendants know or suspect that the student will be unable to repay
23 the loan.  Defendants profit from applying this pressure because federal student loans are fully
24 guaranteed by the federal government, so that Bridgepoint gets paid regardless of its students'
25 ability to repay loans, a component of which is how well Defendants' programs prepare each
26 student for the job market.  In other words, Bridgepoint's business model relies almost entirely
27 on securing funding from the federal government through misleading and deceptive tactics,
28 selling a product that essentially ensures that a significant number of the students who must

CLASS ACTION COMPLAINT

1  repay the loans will be unable to do so, and profiting at the expense of the students, the federal

2  government and, by extension, the American taxpayer.

3       16.     Bridgepoint is motivated to make these misrepresentations to induce prospective

4  students to apply for federal student loans in maximum allowable amounts, in part because

5  Bridgepoint can derive up to 90% of its total revenues from federal funding.  Title IV allows

6  for-profit universities to secure all but ten percent of their total funding from the federal

7  government, including federal student loan money, a requirement known as the "90/10" rule.

8  Defendants' executives are aware of this ceiling and discuss ways in which to reach the 90%

9  maximum, including by pressuring students to "max out their federal loans."

10       17.     Defendants also specifically target active military and military veterans for their

11  misleading recruitment practices to capture additional profits.  The money Bridgepoint receives

12  from veterans, largely via federal tuition assistance programs, such as the Post-9/11 GI Bill,

13  does not count towards the 90% cap, even though it is federal money.  Defendants exploit

14  veterans and active military to end-run the 90/10 rule, all in the name of profit.

15       18.     Bridgepoint devotes significant energies to this end-run of the 90/10 rule by

16  dedicating divisions of its enrollment advisors to focus on military recruitment.  Bridgepoint

17  sends these divisions to bases to recruit active duty personnel and veterans in person.  These

18  advisors are trained to engage in the same misleading practices to recruit and enroll as many

19  students as possible, without regard for the recruits' best interests.

20       19.     Bridgepoint and its CEO have profited handsomely from their wrongdoing: last

21  year Bridgepoint CEO Andrew Clark earned more than $20 million.

22  **PARTIES**

23  **Plaintiff**

24       20.     Plaintiff Betty Guzman is a citizen and resident of Indiana.  She enrolled in

25  online courses with Ashford in 2006 after speaking with an online enrollment advisor.  Ms.

26  Guzman completed approximately 20 online courses.  Ashford alleges that she owes them over

27  $3,600, and refuses to issue her diploma.

28  / / / / /

6
CLASS ACTION COMPLAINT

**Defendants**

21.     Defendant Bridgepoint was founded in 2004 as a Delaware corporation with its company headquarters at 13500 Evening Creek Drive North. Suite 600, San Diego, CA 92128. In 2005, Bridgepoint purchased The Franciscan University of the Prairies, then a non-profit campus-only college in Iowa, then renamed it Ashford University, and converted it into a for-profit online school.  Bridgepoint next purchased the non-profit campus-only Colorado School of Professional Psychology, then renamed it University of the Rockies, and converted it into a for-profit online school.  Bridgepoint hires all employees for both academic institutions, and maintains small campuses in Clinton, Iowa (Ashford) and Colorado Springs, Colorado (The Rockies).  Bridgepoint held an initial public offering on April 14, 2009, and is one of the largest publicly-traded for-profit college companies in the United States.

22.     Defendant Ashford University is an academic entity founded by Bridgepoint in March 2005 to run the college formerly known as The Franciscan University of the Prairies, founded in 1918.  Ashford maintains a small campus in Clinton, Iowa, but 99% of the institution's students are enrolled only in an "online" program.

23.     Defendant University of the Rockies is an academic entity founded by Bridgepoint in September 2007 to run the college formerly known as Colorado School of Professional Psychology.  The Rockies maintains a small campus in Colorado Springs, Colorado, but 99% of the institution's students are enrolled only in an "online" program.

**Non-Defendant Executive Officers of Bridgepoint**

24.     Andrew S. Clark ("Clark") has served as Chief Executive Officer since he founded Bridgepoint in 2004.  He has also held the position of Bridgepoint's President since February 2009.  Clark was on the Board of Trustees of Ashford from March 2005 to December 2008 and he is on the Board of Trustees for The Rockies currently.  Clark received $20,532,304 in compensation from Bridgepoint in 2009 alone, the only year for which data is currently available.  He is a citizen of California and resident of San Diego County, with residences in La Jolla, Rancho Santa Fe and San Diego.

/ / / / /

CLASS ACTION COMPLAINT

25.     Christopher Spohn ("Spohn") is the Senior Vice President and Chief Admissions Officer.  He manages all admissions functions for Bridgepoint's two academic institutions.

26.     Rodney T. Sheng ("Sheng") has been the Senior Vice President and Chief Administrative Officer since November 2008, overseeing all administrative functions for Bridgepoint's two academic institutions, and originally joined Bridgepoint in 2004.

27.     Charlene Dackerman ("Dackerman") is the Senior Vice President of Human Resources, and is responsible for supervising and coordinating all human resources functions for Bridgepoint and its two academic institutions.

28.     Ross L. Woodward ("Woodward") is the Chief Marketing Officer of Bridgepoint.  He oversees all marketing and public advertising for Bridgepoint's two academic institutions, including the department responsible for training enrollment advisors in marketing to prospective students.

29.     Jane McAuliffe ("McAuliffe") is the Chancellor/President of Ashford University.  She also served as the Vice President of Academic Affairs from September 2007 to November 2008.

30.     Charlita Shelton ("Shelton") is the President of The Rockies.

## CLASS ACTION ALLEGATIONS

31.     Plaintiff brings this action both on behalf of herself and as a class action under F.R.C.P. 23(a) and 23(b) on behalf of the following Class:

> All persons in the United States who enrolled in and/or attended classes offered by Bridgepoint Education, Inc. through either of its two academic institutions, Ashford University or University of the Rockies, during the period from approximately March 1, 2005 through the present (the "Class Period").  Excluded from the class are defendants, defendants' immediate families, subsidiaries, affiliates, successors-in-interest, representatives, trustees, executors, administrators, heirs, assigns or transferees, any person acting on  behalf of defendants, all governmental entities, and co-conspirators.

32.     Plaintiff does not know the exact number of Class members because such information is in the exclusive control of Defendants.  Upon information and belief, Plaintiff

CLASS ACTION COMPLAINT

believes that there are tens of thousands of Class members, geographically dispersed throughout the United States, such that joinder of all Class members is impracticable.

33.     Plaintiff's claims are typical of the claims of the Class in that:

(a)     Plaintiff was enrolled in an online degree program offered by Defendants during the Class Period;

(b)     Plaintiff was induced to enroll in the online degree program by identical affirmative written misrepresentations published by Bridgepoint, uniform scripted affirmative oral misrepresentations made by Bridgepoint enrollment advisors, and through Defendants' material omissions;

(c)     Plaintiff enrolled in online classes offered by Defendants during the Class Period;

(d)     Plaintiff was damaged by the wrongful conduct of Defendants; and

(e)     The relief sought is common to the Class.

34.     Questions of law or fact arise from Defendants' unfair and misleading conduct that are common to the Class.  Questions of law or fact common to the Class include but are not limited to:

(a)     whether Defendants misrepresented material facts about their academic institutions to the Class;

(b)     whether Defendants misrepresented material facts about federal student loan requirements to the Class;

(c)     whether Class members were recruited by Defendants to attend one of Bridgepoint's academic institutions;

(d)     whether Class members enrolled in and/or attended online classes offered by Defendants;

(e)     whether Defendants improperly provided prohibited incentives to their enrollment advisors;

(f)     whether Defendants improperly targeted veterans and active duty military personnel through misleading marketing practices;

CLASS ACTION COMPLAINT

(g)     whether Defendants engaged in unfair and/or unlawful business practices during the Class Period;

(h)     whether Defendants engaged in unfair and/or unlawful marketing practices, including false advertising, during the Class Period;

(i)     whether Defendants had a duty to disclose material facts to Class members;

(j)     whether Defendants failed to disclose material facts to Class members;

(k)     whether Defendants breached the implied covenant of good faith and fair dealing implied in student enrollment contracts; and

(l)     whether class-wide damages, declaratory and/or injunctive relief is appropriate and, if so, the proper measure of the damages, declaratory and/or injunctive relief.

35.     These questions of law or fact are common to the Class, and predominate over any other questions affecting only individual class members.

36.     Plaintiff will fairly and adequately represent the interests of the Class in that:

(a)     Plaintiff is typical of former students of online degree programs offered by Defendants;

(b)     Plaintiff was induced to enroll in an online degree program offered by Defendants through misrepresentations and/or omissions in marketing and/or unfair business practices; and

(c)     Plaintiff has no conflicts with any other member of the Class.

37.     Plaintiff has retained competent counsel who are experienced in class action litigation.

38.     A class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.

39.     Prosecution of separate actions by individual class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for the Defendants.

CLASS ACTION COMPLAINT

40.     Injunctive relief is appropriate as to the Class as a whole because Defendants have acted or refused to act on grounds generally applicable to the Class.

41.     Plaintiff reserves the right to expand, modify, or alter the class definition in response to information learned during discovery.

## FACTUAL ALLEGATIONS

**Background**

42.     Bridgepoint is a for-profit higher education company that owns and operates two academic institutions, Ashford and The Rockies.  These schools offer Associate, Bachelors, Masters and Doctoral programs, primarily online. As of December 31, 2009, the Company had more than 5,800 employees.

43.     As of June 30, 2010, the Company had 67,744 students enrolled in its institutions, 99% of whom were attending classes exclusively online.  The Company purports to offer approximately 1,200 courses and 70 degree programs with 130 concentrations and specializations.

44.     The Company has experienced skyrocketing student enrollment at its universities.  Total student enrollment at Ashford and The Rockies increased 115.4% to 42,025 students at March 31, 2009, compared with 19,509 students at the end of the first quarter of 2008.  New student enrollment for the first quarter of 2009 at Bridgepoint's academic institutions was approximately 16,800, an increase of 90.9%, compared with new enrollments of approximately 8,800 for the first quarter of 2008.

45.     Bridgepoint's explosive enrollment growth at its online academic institutions is a direct result of misleading marketing tactics designed to recruit students to attend its schools, and its implementation of federally-prohibited employee incentive programs that were designed to encourage "enrollment advisors" to recruit as many students as possible.

**Bridgepoint's Marketing Strategy Is Built On Misrepresentations**

46.     Bridgepoint recklessly or negligently employs misrepresentative marketing tactics designed to entice prospective students to enroll at its universities and apply for federal loans they do not need and cannot pay back.  Specifically, Bridgepoint hides information from

1   prospective students on its websites, and misleads students by affirmative misrepresentations or

2   material omissions regarding the true cost of attending its universities, the quality of academic

3   instruction, students' post-graduation employability, and students' needs for federal student

4   loans and their repayment obligations.  These tactics are designed to sign up as many students

5   as possible, and to sign up students for as much federal loan money as possible, all in order to

6   maximize Bridgepoint's profits at the expense of its students, the federal government, and the

7   American taxpayer.

8   ***Bridgepoint Improperly Hides Information From Prospective Students on Its Websites***

9       47.      Federal law requires educational institutions that receive Title IV funds from the

10  federal government to "make certain information readily available to enrolled and prospective

11  students.  Institutions may satisfy their disclosure requirements by posting the information on

12  their Internet Web sites.  Information to be provided includes: tuition, fees, and other estimated

13  costs; the institution's refund policy; the requirements and procedures for withdrawing from the

14  institution; a summary of the requirements for the return of Title IV grant or loan assistance

15  funds; the institution's accreditation information: and the institution's completion or graduation

16  rate."  Both federal and California law require academic institutions to make this information

17  readily available to prospective students ***before*** they enroll in any program.

18      48.      Prospective Ashford or The Rockies students obtain information about the

19  schools before enrolling primarily by accessing the schools' websites.  But Defendants employ

20  a sophisticated - and misleading - tactic in displaying information on their websites.  When

21  prospective students enter the search terms "Ashford University" or "University of the

22  Rockies" into an internet search engine, the first several search results direct individuals to a

23  streamlined, basic site that offers vague and misleading praise for the university and an option

24  to enroll online.  A student who tries to find specific information on either site, including the

25  information required by federal disclosure law, are directed only to an option to complete an

26  online enrollment form, in violation of federal and California law.  Although more

27  comprehensive websites exist for both schools, they cannot be easily accessed by prospective

28  students without previously knowing the exact web addresses.

*Defendants Misrepresent the True Cost of Attending Ashford and The Rockies*

49.     Defendants uniformly misrepresent the true cost of attending Ashford and The Rockies to all potential and enrolled students.  In particular, Defendants misrepresent to potential and enrolled students that Ashford and The Rockies offer some of the lowest tuition, most affordable degree programs available when in fact they offer among the highest cost, least affordable degree programs.

50.     For instance, Ashford's website claims that the school represents "higher education made affordable . . . You deserve a quality education at an affordable price . . . You'll find Ashford University, founded in 1918, is an ideal choice for you as a working adult or someone with an uncompleted degree because Ashford is affordable: ***benefit from one of the lowest program costs.***"  The website's "Military Benefits" page also claims that Ashford "offers one of the lowest tuition costs available" without specifying anywhere on its enrollment site the actual cost of attendance.

51.     In reality, Ashford's undergraduate tuition rates are among the highest in the country, at $372 per credit hour.  The U.S. Department of Veterans Affairs (the "VA") publishes an annual table listing the state-by-state rates for "the highest in-state, undergraduate, public tuition" in each state in the country.  In determining which schools are the most expensive, the VA explains that "all undergraduate program costs were taken into consideration to determine the highest in-state maximum tuition per credit hour and the maximum fees per term.  These figures may include program tuition for high cost programs such as flight courses taken as part of a degree requirement or undergraduate pharmacy, nursing and engineering degrees."  In other words, the VA's table lists the costs to attend the most expensive public colleges in each state and territory in the country.  In the last updated table, published August 30, 2010, 28 states' most expensive public colleges charged less than Ashford's $372 per credit hour.  Ashford University charges more tuition per credit hour than all of the public colleges and universities in over half of the states in the entire nation, despite its claims to the contrary.

/ / / / /

/ / / / /

52.     For students in many states the most expensive  public school alternatives cost less than half of what Ashford charges in tuition:

| State/Territory | Maximum In-State Tuition Rate | Percentage of Ashford's Cost |
|---|---|---|
| Alaska | $170 | 46% |
| Arkansas | $210 | 56% |
| Montana | $205 | 55% |
| Nebraska | $251 | 67% |
| Nevada | $156 | 42% |
| New Mexico | $229 | 62% |
| Oklahoma | $188 | 50% |
| Puerto Rico | $90 | 24% |
| South Dakota | $99 | 27% |
| Utah | $238 | 64% |
| Virgin Islands | $125 | 34% |
| Wyoming | $99 | 27% |

53.     Defendants' claim that Ashford offers one of the most affordable college educations for students is just not true.  The harsh reality is that an Ashford student who completes their undergraduate degree with the minimum 120 credits will pay nearly $45,000 in tuition alone, not including the outrageous hidden fees, described below.

54.     Tuition at The Rockies is even more expensive, at $682 per credit hour for the school's Master's program and $882 per credit hour for the doctorate degree.  The $882/credit hour charge is far higher than average tuition rates.

55.     The exorbitant costs, coupled with the relative worthlessness of the degree for job placement purposes, make Bridgepoint's statements about its institutions' "great value" false and misleading.

56.     In addition to Defendants' written misrepresentations regarding the value of a Bridgepoint education, prospective students are systematically orally misled by Bridgepoint

CLASS ACTION COMPLAINT

enrollment advisors, who misrepresent the true cost of attendance through scripts provided by Bridgepoint.  Enrollment advisors' misleading claims that Ashford offers "one of the cheapest undergraduate degree programs in the country" induce students to enroll and to stay enrolled.

57.     Enrollment advisors, pressured to enroll every potential student to maximize profit so they can keep their jobs, misrepresent the total cost of attendance at Bridgepoint's schools by quoting to prospective students tuition rates for nine months of attendance when a program actually lasts twelve months, and by quoting only the tuition rates during the enrollment process, while failing to disclose numerous hidden administration fees.  Only after a student has enrolled and promised to attend and pay for classes does s/he become aware of the following fees:

| Fee | Cost at Ashford | Cost at Rockies |
|---|---|---|
| Technology Service Fee | $1290 | $250 |
| Sponsored Professional Training Assessment (per credit hr) | $30 | N/A |
| Prior Learning Assessment Experiential Learning Essay Assessment (per course) | $125 | N/A |
| Books and Materials (per course) | $100 | $200 |
| Graduation Fee | $110 | $500 |
| Education Partnership Fee | $30 | N/A |
| **TOTAL** (based on a min. 120 credit hrs for undergraduate degree at Ashford; 68 credit hrs. for doctoral degree at The Rockies) | **$14030** | **$5350** |

***Bridgepoint Misrepresents the Quality and Reputation of Its Academic Programs, Its Job Placement Rate, and Its Students' Post-Graduate Employability***

58.     Defendants also makes uniform written and scripted oral misrepresentations about the quality, reputation, and marketability of the education earned through the academic programs.

59.     Ashford's and The Rockie's websites both state the following in the "Frequently Asked Questions" section of their respective sites:

**How does my degree compare to degrees from other schools?**
Your degree from Ashford University/University of the Rockies is equally valuable, accepted, and honorable as any equivalent degree you could earn from another accredited school or university, whether on a traditional campus or online.  The only

1
2

difference between a degree from Ashford University/University of the Rockies and a degree from another school is the money and time you'll save through Ashford University/University of the Rockies.

3    60.    This statement is false and misleading for at least two reasons.  First, it

4   misleadingly suggests to prospective students that degrees from one of Bridgepoint's academic

5   institutions are somehow of "equal value" as all other accredited schools or universities.

6   Second, this statement misleadingly suggests that degrees from Ashford or The Rockies will be

7   recognized as valid by potential employers or other academic institutions that recognize

8   degrees from other accredited schools and universities.  This is not so.  Many universities will

9   not accept any transfer credits from any online universities, nor will they recognize an

10   undergraduate degree from an online university as satisfying the academic prerequisites for

11   admission to a graduate or professional degree program.  Additionally, many employers

12   specifically do not recognize degrees from online institutions as proof that a prospective

13   employee qualifies for a certain position, whereas the same employer will recognize an

14   identically titled degree from a traditional campus as proof of qualification.

15    61.    For example, The Rockies offers certificate programs, masters degrees, and

16   doctorate degrees in psychology.  In order to practice psychology in any state or with the

17   military, one must possess both a relevant degree in psychology and a professional license from

18   the jurisdiction where the student wishes to practice.  However, The Rockies does not offer any

19   degree programs that are recognized as relevant academic degrees by states or the military, nor

20   are they intended to prepare students for professional licensure.  Although the school makes

21   misrepresentations to the contrary when procuring students, The Rockies admits in the fine

22   print of its program enrollment form that "this program is not intended to prepare students for

23   professional licensure or certification in any field, regardless of concentration."

24    62.    Even though the Rockies knows its degrees are of almost no value for students

25   planning to become a licensed psychologist, school President Carlita Shelton misleadingly

26   states on the home page of the school's website that *"the University's goal is to provide a*

27   *professional graduate education in psychology to individuals who seek licensure as*

28   *psychologists."*  This statement is false and misleading, because, by the school's own

admission elsewhere, the programs are not intended to prepare students for professional

licensure.

63.     Bridgepoint's enrollment advisors make uniform scripted oral misrepresentations

about the quality and reputation of its schools, describing them as great schools with amazing

professors who offer individualized attention to students.  These advisors explain to prospective

students, following scripts from Bridgepoint, that a degree from Ashford or The Rockies will

prepare them and qualify them for a number of professional occupations, and claim that the

degree will provide them with a competitive advantage over graduates from other schools.

These statements are false and misleading, because the quality of instruction at the online

universities is uniformly subpar, the instructors are far less qualified than professors from

supposedly comparable universities, and degrees from these schools actually place graduates at

a competitive disadvantage, considering that many employers refuse to even recognize the

validity of the degrees.

64.     For example, many classes offered by The Rockies are taught by graduate

students rather than professors or licensed practitioners, and, on more than one occasion,

students in these purportedly graduate level classes were preemptively awarded "A" grades for

assignments they had not completed.  In at least one instance, a professor told students in

person that his wife graded many of his students' papers.  Moreover, the highly-advertised

residency program was run entirely by graduate students, and not a single professor running the

residency program even held a doctorate degree.

65.     Students seeking to transfer, or seeking employment, learn the negligible value

of their degree.  One student who completed one year of a purported doctoral program

submitted their transcript, with a 4.00 grade point average, to outside psychology professionals

and to representatives of the U.S. Navy's psychology program.  The Navy refused even to look

at the transcript, explaining that any online degree that was not accredited by the American

Psychological Association (APA) was unacceptable for any psychology position with the U.S.

military.  Civilian professionals stated that the student would have to begin the psychology

degree program again at an APA accredited institution.

*Bridgepoint Employs Misleading Tactics Regarding Federal Tuition Assistance*

66.     Defendants have an incentive to induce prospective students to apply for the maximum dollar amount of federal loans possible, because Bridgepoint can accept up to 90% of its funding from the federal government's loan programs, because the loans are disbursed directly to the school, and because the loans are completely guaranteed by the federal government.  Defendants are motivated solely by profit to create and implement uniformly misrepresentative advertising and enrollment practices and policies to induce prospective and enrolled students to apply for federal student loans that they do not need, may not be able to repay, and for which they would not have applied but for Defendants' misrepresentations.

67.     For example, Bridgepoint employees improperly pressure prospective students to enroll before completing their financial aid applications, pursuant to uniform written scripts and training Defendants provided to enrollment advisors.  Once enrolled, Bridgepoint completes and submits the financial aid applications on the students' behalf, requesting the maximum allowable amount even if the amount exceeds the students' needs.  During this process, enrollment advisors also fail to tell prospective students that the loans are disbursed directly to the school and not the individual, thus creating an opportunity for the Defendants to demand payment immediately upon enrollment rather than allowing students to defer payment until after graduation.

68.     Bridgepoint also expects enrollment advisors to mislead prospective students regarding how much of their degree program will be covered by federal financial assistance.  In at least one instance, an enrollment manager sought to enroll a student who expressed reluctance because of the length of time it would take to graduate.  This manager suggested that the student enroll and take twice the course load to graduate in half the time, but the manager did not disclose that only half of these classes could be paid for through federal financial aid and that the student would have to pay the rest out of pocket, even though the manager knew the student could not afford to do so.  The manager successfully induced the prospective student to enroll as a result of this misrepresentation.

/ / / / /

1      *Defendants Target Veterans for Misrepresentations*

2            69.      Bridgepoint specifically targets veterans and active duty military personnel for

3      enrollment, employing the same misrepresentative marketing practices described above, in a

4      deplorable attempt to maintain Title IV standing while it is end-running the 90/10 rule.

5      Bridgepoint has been successful in this perverse endeavor so far, and receive billions of dollars

6      from the federal government in federal tuition assistance.  In fact, Bridgepoint focuses divisions

7      of enrollment advisors on the purpose of recruiting active military personnel and military

8      veterans.  These divisions often are composed of veterans who go directly to military bases to

9      recruit service members.

10           70.      Bridgepoint's motivation is transparent.  In order to maintain its Title IV

11     standing, Bridgepoint must derive no less than 10% of its revenues from sources other than

12     Title IV funds and certain other federal programs.  However, the money Bridgepoint and other

13     for-profit universities receive from veterans via the Post-9/11 GI Bill does not count towards

14     the 90% limit these schools can receive in federal funding.  Thus, Bridgepoint can collect

15     unlimited money from the federal government via the Post-9/11 GI Bill and still maintain its

16     Title IV standing for purposes of receiving federal student aid.

17           71.      As Iowa Senator Tom Harkin explained on December 9, 2010, this end-run by

18     for for-profit universities to receive unlimited federal money has "unintentionally subjected

19     misleading marketing campaigns, educational programs far more expensive than comparable

20     public or non-profit programs, and a lack of needed services."

21           72.      Bloomberg News recently reported that twenty for-profit colleges "reaped $521

22     million un U.S. taxpayer funds in 2010, seven times more than in 2006, by recruiting armed-

23     services members and veterans through misleading marketing," noting that "Bridgepoint

24     Education, Inc., based in San Diego, ranked second [in receiving tuition assistance from the

25     Defense Department] with $41.2 million."  Bloomberg News, "For-Profit Colleges Scam

26     Military for $521 Million, Report Says," December 9, 2010.

27     / / / / /

28     / / / / /

CLASS ACTION COMPLAINT

73.     The Bloomberg News article explained the motivation behind Bridgepoint's

increasing the focus of their misleading marketing campaigns on the military:

> *Getting the money from military personnel helped the companies circumvent a cap on the aid they can receive from the Education Department, their main source of income*, according to the report from Iowa Democrat Tom Harkin, chairman of the Senate Health, Education, Labor and Pensions committee. Congress should protect veterans and taxpayers from documented abuses by those colleges, the report's authors said.

> The Post 9/11 GI Bill, which Congress passed in 2008, raised educational benefits for almost all military veterans, and in some cases allowed them to pass money for school to spouses and children, according to the report.  The colleges made it a priority to recruit military members to exploit the surge in benefits, the authors said.

> "New Tool"

> A 1992 law allows for-profit colleges to get as much as 90 percent of their revenue from federal financial aid. The companies seek military students and veterans because their education benefits are counted as a non-government source, according to the Harkin report.

74.     Defendants' profiteering is at the expense of its military and veteran students.

Active military and military veterans who Defendants misled into enrolling have dropped out

and defaulted on loans at a much higher rate than veterans at non-profit colleges:

> Dropout Rates

> Statistics suggest that the for-profit colleges attended by military members have high dropout rates and poor educational results, according to the report.  At 4 of the 5 for-profit colleges receiving the most in Post-9/11 GI Bill funding, loan repayment rates were below 37 percent, according to the report.

> At the same 4 schools, 24 percent of the students defaulted on their loans, according to the report.  The national rate of student default on government loans was 7 percent in the academic year ended 2008, the most recent period for which data are available, according to the Education Department.

75.     In addition to subjecting military students to the same misrepresentations and

material omissions as civilian students, Bridgepoint engages in a number of misleading

practices aimed directly at veterans who are considering enrolling.  For example, Ashford's

enrollment website includes a page entitled "Military Benefits."  On this page, Ashford claims

to "offer[] one of the lowest tuition costs available" without specifying anywhere on its

1    enrollment site the actual cost of attendance.  However, as shown above, Ashford's tuition rates

2    are among the highest in the country at $372 per credit hour.  The VA, which administers the

3    Post-9/11 GI Bill, publishes an annual table on its website containing the state-by-state

4    maximum dollar amount of tuition and fees that the Post-9/11 GI Bill and other veteran

5    education assistance programs will cover.  As the site explains, these maximums are set "in

6    accordance with the VA's statutory requirement to determine the highest in-state,

7    undergraduate, public tuition."  In other words, the VA's table lists the costs to attend the most

8    expensive public colleges in each state of the country.  In the last updated table, published

9    August 30, 2010, 28 states' most expensive public colleges charged less than $372 per credit

10   hour.  Ashford, which claims to offer veterans "one of the lowest tuition costs available,"

11   charges more tuition per credit hour than each of the public colleges and universities in 56% of

12   the states in the entire nation.

13        76.      The variance between the VA's published maximum rates and Ashford's rates

14   has a particularly important impact on veterans.  The Post-9/11 GI Bill will only pay for tuition

15   costs up to the VA's published maximum charge in a given state.  Ashford's "lowest tuition

16   costs" are financially-paralyzing for veterans in 28 states where the VA's generous benefits are

17   not enough to cover the unreasonably high costs of attending Ashford.

18        77.      The result is that Defendants encourage veterans, who otherwise should never

19   have been forced to take out loans to finance their postsecondary education, to apply for loans

20   or to pay the difference out of pocket, such that military personnel and veterans often end up

21   with far more debt than they can pay back or than was necessary.  The Wall Street Journal

22   observed that student loan default rates among veterans at for-profit institutions are much

23   higher than for veterans at comparable public or non-profit schools.  If Defendants had not

24   misled those who served our country into attending such expensive and low-quality institutions,

25   these students likely would have never attended Ashford or The Rockies, never taken out a

26   loan, and would have graduated from a more reputable college without debt.

27   / / / / /

28   / / / / /

*__Bridgeport's Prohibited Incentive System Encourages "Enrollment Advisors" to Employ__*
*__Misleading and Harassing Marketing Tactics__*

78.     Title IV education programs prohibit Defendants from providing incentive payments to employees for securing student enrollment.  However, Bridgepoint provides incentive payments to its enrollment advisors for recruiting and securing student enrollment, and fosters a competitive environment such that an enrollment advisor's success or failure is determined by the number of prospective students the advisor actually enrolls.   The result of these perverse incentives is that enrollment advisors give false and misleading information to get students to enroll, and also agree to enroll prospective students even when it is obvious that the prospective student did not qualify or would not benefit from the program.

79.     Bridgepoint's hundreds of enrollment advisors work in large call centers and are divided into teams.  The highest performing teams - determined solely by number of students enrolled - win prizes and often receive substantial raises.  Underperforming team members do not receive bonuses or pay raises, and often are fired for failure to enroll more students.  This type of hypercompetitive atmosphere fosters a culture in which misrepresentations are encouraged in order to drive up enrollment numbers, and violates federal law.

80.     Bridgepoint enrollment advisors are required to track the number of contacts they make with referrals, prospective students, and enrolled students, as well as the number of students they enroll in six month increments.  Bridgepoint requires its enrollment advisors to maintain communication with students they enroll, but only to ensure the students remain enrolled long enough for Bridgepoint to keep the money from their federal student loans. Bridgepoint requires its enrollment advisors to track recruitment data on charts and individualized New Student Checklists and awards enrollment advisor points based on the number of contacts made and on the number of students enrolled.  Enrollment advisors with the most points earn the most money; those with the fewest points, or who do not meet quotas, are disciplined and/or terminated. Defendants also track enrollment advisors' recruitment data with detailed periodic reports.

/ / / / /

1       81.     Enrollment advisors that do not enroll enough students received several verbal

2  and written warnings, and learn the refrain "applications save your seat, and retention gets you

3  paid."  Defendants repeatedly warn enrollment advisors in writing that they will be terminated

4  if they do not meet the quotas and goals mandated by Bridgepoint.  These actions are improper

5  and unlawful, as they require an enrollment advisor to submit a number of applications

6  regardless of his/her prospective students" desire to enroll or not.

7  ***The Government Accountability Office Exposes Industry-Wide For-Profit College***

8  ***Misfeasance***

9       82.     In 2009, the federal government instructed the U.S. Government Accountability

10  Office ("GAO") to investigate the practices of for-profit colleges and universities like

11  Bridgepoint for the following reasons:

12        a.     **Exploding Enrollment**: Enrollment in these colleges has grown far

13             faster in the last decade than at traditional higher-education institutions.

14             Enrollment in for-profit colleges has grown from about 365,000 students in 2004

15             to approximately 1.8 million in 2009;

16        b.     **Growth of Publicly-Traded For-Profit Colleges**: The fourteen largest

17             for-profit corporations (including Bridgepoint), worth $26 billion as of July

18             2010, enrolled some 1.4 million students in their wholly owned subsidiary for-

19             profit colleges;

20        c.     **Disproportionate Federal Financial Assistance**: In 2009, students at

21             for-profit colleges  received  more  than  $4  billion  in  Pell  Grants  (a federal

22             government student tuition grant) and more than $20 billion in federal loans

23             provided by the Department of Education.   This represents roughly 25% of all

24             Federal Pell Grants and federal loans given to college students throughout the

25             country, despite the fact that for-profit college students represent only

26             approximately 9% of all college students; and

27        d.     **Disproportionate Student Loan Default Rates**: Students at for-profit

28             colleges also represent a vastly disproportionate percentage of students who

CLASS ACTION COMPLAINT

1    default on their federally administered student loans.  When a student defaults

2    on a federal loan, the government and the American taxpayer—not the academic

3    institution—must pick up the tab.  In 2009, despite representing only 9% of

4    college students throughout the country, students at for-profit colleges and

5    universities were responsible for 44% of all student loan defaults in the country.

6    83.    On August 3, 2010, the GAO issued a report concluding that for-profit

7  educational institutions, like Bridgepoint, engaged in a pattern of behavior where they

8  systematically recruited students through deceptive marketing, harassing recruitment tactics,

9  and prohibited employee incentive programs, all in an attempt to increase student enrollment

10  and drive up company profits.  The GAO report confirmed the systematic nature of the

11  deceptive and unlawful practices described above that are employed by for-profit institutions

12  like Bridgepoint, concluding that they misrepresented to prospective and enrolled students,

13  among other things, the true cost of attending the school, their ability to receive and obligation

14  to repay federal tuition assistance, and their post-graduation employability and salary potential.

15  The report further confirmed that many of these schools also paid bonuses to enrollment

16  advisors based directly on the numbers of students the advisors enrolled or retained with the

17  school in direct violation of federal law.  The GAO also found that every for-profit institution

18  investigated made deceptive and misleading statements regarding federal financial aid, in a

19  direct effort to secure a students' application for the maximum allowable loan amount under

20  federal guidelines.

21    84.    The GAO report further concluded that many of these for-profit institutions

22  specifically targeted veterans and active military personnel by offering misleading military

23  benefits plans.  For example, many schools recruited potential students who received tuition

24  assistance under the Post 9/11-GI Bill by claiming to offer military discounts on tuition, when

25  in reality they were charging tuition rates far in excess of what the Post 9/11-GI Bill and other

26  veterans' tuition assistance programs cover.

27  / / / / /

28  / / / / /

1

## EQUITABLE TOLLING ALLEGATIONS

85.     At all relevant times when Defendants induced Plaintiff and members of the Class to enroll at Ashford or The Rockies through misleading misrepresentations and under false pretenses, Defendants concealed relevant facts that would have allowed Plaintiff to discover the false and misleading misrepresentations.  As a result of these misrepresentations, equitable tolling of the statute of limitations applies as to the claims asserted by Plaintiff and the Class.  Any applicable statute of limitations that might otherwise bar certain of the claims at issue should be tolled because Defendants actively misled Plaintiff and the Class with respect to the true cost of attending Bridgpoint's universities, the quality of the academic instruction, students' post-graduation job prospects, employability and earnings potential. The Rockies' accreditation under the APA and ability to qualify graduates for professional psychology licensure, federal student loan repayment options and obligations, and Defendants' students' federal loan repayment rate.

86.     Plaintiff exercised due diligence to discover Defendants' wrongdoing. However, such wrongdoing was not discoverable prior to the date of the filing of this action since Defendants concealed their wrongdoing through misrepresentation.  Defendants have never publicly disclosed their wrongdoing in making the uniform, Class-wide written and oral misrepresentations and material omissions.  Plaintiff exercised due diligence by promptly filing this Complaint after discovering the facts giving rise to these claims.

## FIRST CLAIM FOR RELIEF

### *Breach of Contract*

87.     Plaintiff realleges and incorporates by reference each and every allegation above as if fully set forth herein.

88.     Defendants entered into contracts with Plaintiff and members of the Class, under which agreements Defendants agreed to provide affordable postsecondary education at among the lowest rates of comparable institutions, and that the education provided would prepare and qualify Plaintiff and members of the Class for numerous professional occupations after graduation, including professions requiring post-graduation licensure.

89.     Plaintiff and the Class complied with all their obligations under the contracts.

90.     Plaintiff and members of the Class have been deprived of the benefits of their agreements with Defendants.

91.     Defendants breached their contracts with Plaintiff and the Class by failing to deliver the benefits promised.

92.     As a result of Defendants' breaches of contract, Plaintiff and members of the Class have suffered damages.

93.     Accordingly, Defendants are liable to Plaintiff and members of the Class for breaching their contracts.

## SECOND CLAIM FOR RELIEF

### *Breach of the Implied Covenant of Good Faith and Fair Dealing*

94.     Plaintiff realleges and incorporates by reference each and every allegation above as if fully set forth herein.

95.     There is a covenant of good faith and fair dealing implied in every contract. This implied covenant requires each contracting party to refrain from doing anything to injure the right of the other to receive the benefits of the agreement.

96.     Defendants breached the implied covenant of good faith and fair dealing in their contracts with Plaintiff and the Class by taking steps to interfere with the ability of the Class to receive the benefits promised by Defendants.

97.     As a result of Defendants' breaches of the implied covenant of good faith and fair dealing, Plaintiff and members of the Class have been damaged.

98.     Accordingly, Defendants are liable to Plaintiff and members of the Class for breaching the implied covenant of good faith and fair dealing. Plaintiff seeks actual damages and an injunction ordering Defendants to comply with the obligations of the contracts entered into by the Class and Defendants and to refrain from taking any action to interfere with the Class members' rights to receive contractual benefits.

/ / / / /

/ / / / /

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**THIRD CLAIM FOR RELIEF**

*Violation of Bus. & Prof. Code § 17200*

99.     Plaintiff realleges and incorporates by reference each and every allegation above as if fully set forth herein.

100.     The Unfair Trade Practices Act defines unfair competition to include any "unfair" or "unlawful" business act or practice.  Cal. Bus. & Prof. Code § 17200.  Unfair competition also includes "unfair, deceptive, untrue or misleading advertising."  Id.  The Act also provides for injunctive relief and restitution for violations. Id. § 17203.

101.     Plaintiff brings this cause of action is brought on behalf of herself, members of the Class, and members of the general public pursuant to California Business & Professions Code sections 17200 et seq.  Under Business & Professions Code § 17200 et seq., Plaintiff is entitled to enjoin Defendants' wrongful practices and to obtain restitution for the monies paid to Defendants by reason of Defendants' unlawful and/or unfair acts and practices.

102.     Defendants injured members of the Class and the general public as a direct and proximate result of the acts and practices alleged above.  This Court is empowered to, and should, order restitution to all persons from whom Defendants unfairly and/or unlawfully took money.

103.     Defendants violated Bus. & Prof. Code § 17200 et seq. because they breached their contracts with Plaintiffs and the Class, breached the implied covenant of good faith and fair dealing, violated the Consumer Legal Remedies Act, violated Bus. & Prof. Code § 17500 et seq., negligently misrepresented facts to Plaintiffs and the Class, and violated Title IV of the Higher Education Act of 1965.

104.     Defendants further violated Bus. & Prof. Code § 17200 et seq, by their violations of many provisions of the California Private Postsecondary Education Act of 2009. California's Act prohibits private postsecondary institutions from the following conduct:

/ / / / /

/ / / / /

/ / / / /

a.      Promising or guaranteeing employment, or otherwise overstating the availability of jobs upon graduation (§ 94897(b));

b.      Advertising concerning job availability, degree of skill, or length of time required to learn a trade or skill unless the information is accurate and not misleading (§94897(c)):

c.      Paying any consideration to a person to induce that person to sign an enrollment agreement for an educational program (§ 94897(h));

d.      Compensating an employee involved in recruitment, enrollment, admissions, student attendance, or sales of educational materials to students on the basis of a commission, commission draw, bonus, quota, or other similar method related to the  recruitment,  enrollment,  admissions,  student attendance,  or  sales  of educational materials to students (§ 94897(n)); or

e.      Requiring a prospective student to provide personal contact information in order to obtain, from the institution's Internet Web site, educational program information that is required to be contained in the school catalog or any information required pursuant to the consumer information requirements of Title IV of the federal Higher Education Act of 1965, and any amendments thereto (§ 94897(o)).

105.      Defendants violated each of these provisions by virtue of their unfair, unlawful, and conduct, described in detail, above.

106.      Defendants' unlawful and unfair business acts and practices, as described above, present a continuing threat to members of the Class and of the general public, in that Defendants will continue, unless enjoined, to commit violations of Business & Professions Code § 17200.  This Court has the authority to, and should, grant preliminary and permanent injunctive relief against these acts and practices.

## FOURTH CLAIM FOR RELIEF

### Violation of Bus. & Prof. Code § 17500 et seq.

107.      Plaintiff realleges and incorporates by reference each and every allegation above as if fully set forth herein.

108.      California's False Advertising Act makes it unlawful to "make or disseminate or cause to be made or disseminated before the public [a statement] which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading" with the intent to "induce the public to enter into any obligation relating

1    thereto." Such statements include statements made through "any advertising device," including

2    "over the Internet."  Bus. & Prof. Code § 17500.

3        109.    This cause of action is brought on behalf of Plaintiff and the Class under

4    California Bus. & Prof. Code § 17500 et seq.  Plaintiff is entitled to enjoin Defendants'

5    wrongful practices, and to obtain restitution for the monies paid to Defendants by reason of

6    Defendants' unlawful and unfair conduct under the False Advertising Act.

7        110.    Defendants violated the False Advertising Act by making, disseminating, and/or

8    causing to be made or disseminated, false and misleading statements on their websites and

9    other promotional materials about the true cost of attending Bridgepoint's universities, the

10   quality of the academic instruction, students' post-graduation job prospects, employability and

11   earnings potential, and The Rockies' accreditation under the APA and ability to qualify

12   graduates for professional psychology licensure.  These false and misleading statements were

13   made with the intent to induce the general public, including Plaintiff and the Class, to enroll in

14   Defendants' online degree and certificate programs.

15       111.    Plaintiff and the Class did in fact rely on these false and misleading statements

16   in deciding to enroll in Defendants' online certificate and degree programs.  As a direct and

17   proximate result of the acts and practices alleged above, members of the Class and the general

18   public who enrolled in and/or attended classes at Ashford or The Rockies have been injured.

19   This Court has the authority to, and should, order restitution to all persons from whom

20   Defendants unfairly and/or unlawfully took money.

21       112.    Defendants' unlawful and false and misleading advertising, as described above,

22   presents a continuing threat to members of the Class and of the general public, in that

23   Defendants are continuing, and will continue, unless enjoined, to violate Business &

24   Professions Code § 17500 et seq.  This Court has the authority to, and should, grant preliminary

25   and permanent injunctive relief against such conduct.

26   / / / / /

27   / / / / /

28   / / / / /

1

## FIFTH CLAIM FOR RELIEF

2

### *Violation of the Consumer Legal Remedies Act*

3      113.      Plaintiff realleges and incorporates by reference each and every allegation above

4   as if fully set forth herein.

5      114.      This cause of action is brought on behalf of Plaintiff and the Class under

6   California Civil Code § 1750 et seq.   Under the Consumer Legal Remedies Act, Plaintiff is

7   entitled to enjoin Defendants' wrongful practices by reason of Defendants' unlawful and unfair

8   acts and practices.

9      115.      The Consumer Legal Remedies Act prohibits unfair competition and unfair acts

10   or practices that are undertaken by anyone in a transaction that is intended to result, or which

11   result, in the sale of goods and services.

12      116.      Defendants violated the Consumer Legal Remedies Act by misrepresenting to

13   Plaintiff and the Class the true cost of attendance at Ashford and The Rockies, by

14   misrepresenting the quality of academic instruction at these schools, by misrepresenting

15   students' post-graduation employability, job placement prospects, and qualification for

16   professional licensure, and by misrepresenting prospective students' federal financial assistance

17   options.

18      117.      Defendants' unlawful and unfair business acts and practices, and unfair and

19   misleading advertising, as described above, present a continuing threat to Plaintiff, members of

20   the Class and members of the general public, in that Defendants continue to mislead

21   prospective students into enrolling in programs offered by Bridgepoint, in violation of the

22   Consumer Legal Remedies Act.   This Court has the authority to, and should, grant preliminary

23   and permanent injunctive relief against such conduct.

24      118.      As a result of Defendants' violations of the Consumer Legal Remedies Act,

25   Plaintiff and each member of the Class have suffered damages.  Plaintiff seeks an injunction

26   against Defendants' illegal and unfair business practices.

27   / / / / /

28   / / / / /

CLASS ACTION COMPLAINT

## SIXTH CLAIM FOR RELIEF

### *Negligent Misrepresentation*

119.    Plaintiff realleges and incorporates by reference each and every allegation above as if fully set forth herein.

120.    Defendants made systematic, identical written misrepresentations regarding the cost of attending Ashford and The Rockies, the value of the degree programs offered at these schools, the quality of the schools as compared to other institutions, and students' post-graduation qualification for certain professional licenses. Defendants had no reasonable grounds for believing these representations to be true when they made them.  Regardless, Defendants made these representations in order to induce Plaintiffs and the Class to act in reliance on these representations by enrolling at Ashford or The Rockies, or with the expectation that they would so act.  Plaintiff and each member of the Class relied on these negligent representations before enrolling, and in deciding to enroll.

121.    Plaintiff and the members of the Class were ignorant of the true facts at the time Defendants made the misrepresentations.  Plaintiff and the members of the Class would not have enrolled in Ashford or The Rockies if they had known the true facts.

122.    Plaintiff and members of the Class have been damaged as a proximate result of Defendants' negligent conduct, in an amount in excess of this Court's jurisdiction, the exact amount to be proven at trial.

## DEMAND FOR TRIAL BY JURY

123.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all triable questions of fact raised by the complaint.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the Class Members she seeks to represent in this action, requests the following relief:

a.    A declaration that this action is a proper class action under Federal Rule of Civil Procedure 23 on behalf of the Class as defined herein, and an order directing that reasonable notice of this action be given to each member of the Class;

b.   A declaration that the Defendants' conduct alleged herein constitutes a breach of contract, breach of the implied covenant of good faith and fair dealing, a violation of Business & Professions Code § 17200, a violation of Title IV of the Higher Education Act of 1965, a violation of the California Private Postsecondary Education Act of 2009, a violation of the Consumer Legal Remedies Act, and negligent misrepresentation;

c.   An injunction enjoining Defendant, preliminarily and permanently, from continuing the unlawful conduct alleged herein;

d.   For restitution to Plaintiffs and each member of the Class, as his or her interest may appear, of all sums unlawfully collected by Defendants from the Plaintiffs and other members of the Class since March 1, 2005 through the present;

e.   For disgorgement of all profits obtained by Defendants as a result of its unfair business practices;

f.   For an award for Plaintiffs and the Class for the costs of this suit (including expert fees), and reasonable attorneys' fees, as provided by law; and

g.   For an award for such other and further relief as the nature of this case may require, or as this Court deems just, equitable, and proper.


DATED:   January 12, 2011                         CHAPIN FITZGERALD SULLIVAN LLP



                                                  By: /s/ Douglas J. Brown
                                                       Edward D. Chapin, Esq.
                                                       Kenneth M. Fitzgerald, Esq.
                                                       Jill M. Sullivan, Esq.
                                                       Curtis Carll, Esq.
                                                       Douglas J. Brown, Esq.
                                                       Jennifer M. Chapman, Esq.
                                                       Attorneys for Plaintiff

CLASS ACTION COMPLAINT

JS 44
(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

## I. (a) PLAINTIFFS

BETTY GUZMAN, on behalf of herself and all others similarly situated,

## DEFENDANTS

BRIDGEPOINT EDUCATION, INC., ASHFORD UNIVERSITY, and UNIVERSITY OF THE ROCKIES

'11CV69   W   BGS

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  St. Joseph, IN
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT   San Diego
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Edward D. Chapin, Esq.
CHAPIN FITZGERALD SULLIVAN LLP
550 West C Street, Suite 2000
San Diego, CA  92101
(619) 241-4810

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION (PLACE AN 'X' IN ONE BOX ONLY)

- [ ] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question (U.S. Government Not a Party)
- [X] 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN 'X' IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PT | DEF | | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated or Principal Place of Business in This State | [ ] 4 | [X] 4 |
| Citizen of Another State | [X] 2 | [ ] 2 | Incorporated and Principal Place of Business in Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)   28 U.S.C. Section 1332(d)(2)(A)

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 610 Agriculture | [ ] 422 Appeal 28 USC 158 | [ ] 400 State Reappointment |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 362 Personal Injury - | [ ] 620 Other Food & Drug | [ ] 423 Withdrawal | [ ] 410 Antitrust |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | Medical Malpractice | [ ] 625 Drug Related Seizure of | 28 USC 157 | [ ] 430 Banks and Banking |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | [ ] 365 Personal Injury - Product Liability | Property 21 USC 881 | **PROPERTY RIGHTS** | [ ] 450 Commerce/ICC Rates/etc. |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | [ ] 368 Asbestos Personal Injury Product Liability | [ ] 630 Liquor Laws | [ ] 820 Copyrights | [ ] 460 Deportation |
| [ ] 151 Medicare Act | [ ] 340 Marine | **PERSONAL PROPERTY** | [ ] 640 R.R. & Truck | [ ] 830 Patent | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 152 Recovery of Defaulted Student Loans (Excl. Veterans) | [ ] 345 Marine Product Liability | [ ] 370 Other Fraud | [ ] 650 Airline Regs. | [ ] 840 Trademark | [ ] 850 Securities/Commodities/Exchange |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 371 Truth in Lending | [ ] 660 Occupational Safety/Health | **SOCIAL SECURITY** | [ ] 875 Customer Challenge 12 USC 3410 |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 380 Other Personal Property Damage | [ ] 690 Other | [ ] 861 HIA (13958) | [ ] 891 Agricultural Acts |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury | [ ] 385 Property Damage Product Liability | **LABOR** | [ ] 862 Black Lung (923) | [ ] 892 Economic Stabilization Act |
| [ ] 195 Contract Product Liability | | | [ ] 710 Fair Labor Standards Act | [ ] 863 DIWC/DIWW (405(g)) | [ ] 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 720 Labor/Mgmt. Relations | [ ] 864 SSID Title XVI | [ ] 894 Energy Allocation Act |
| [ ] 210 Land Condemnation | [ ] 441 Voting | [ ] 510 Motion to Vacate Sentence | [ ] 730 Labor/Mgmt. Reporting & Disclosure Act | [ ] 865 RSI (405(g)) | [ ] 895 Freedom of Information Act |
| [ ] 220 Foreclosure | [ ] 442 Employment | **HABEAS CORPUS:** | [ ] 740 Railway Labor Act | **FEDERAL TAX SUITS** | [ ] 900 Appeal of Fee Determination Under Equal Access to Justice |
| [ ] 230 Rent Lease & Ejectment | [ ] 443 Housing/Accommodations | [ ] 530 General | [ ] 790 Other Labor Litigation | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 950 Constitutionality of State Statutes |
| [ ] 240 Torts to Land | [ ] 444 Welfare | [ ] 535 Death Penalty | [ ] 791 Empl. Ret. Inc. Security Act | [ ] 871 IRS - Third Party 26 USC 7609 | [X] 890 Other Statutory Actions |
| [ ] 245 Tort Product Liability | [ ] 440 Other Civil Rights | [ ] 540 Mandamus & Other | | | |
| [ ] 290 All Other Real Property | | [ ] 550 Civil Rights | | | |
| | | [ ] 555 Prison Conditions | | | |

## VI. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

- [X] 1 Original Proceeding
- [ ] 2 Removal from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from another district (specify)
- [ ] 6 Multidistrict Litigation
- [ ] 7 Appeal to District Judge from Magistrate Judgment

## VII. REQUESTED IN COMPLAINT:

[X] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ PROOF

CHECK YES only if demanded in complaint:
JURY DEMAND: [X] YES  [ ] NO

## VIII. RELATED CASE(S) IF ANY (See instructions):

JUDGE _____   Docket Number _____

DATE  1/12/11

SIGNATURE OF ATTORNEY OF RECORD