CHAPIN FITZGERALD SULLIVAN & BOTTINI LLP
    Edward D. Chapin (SBN: 053287)
    echapin@cfsblaw.com
    Jill M. Sullivan (SBN 185757)
    jsullivan@sfsblaw.com
    Francis A. Bottini, Jr. (SBN 175783)
    fbottini@cfsblaw.com
    Douglas J. Brown (SBN: 248673)
    dbrown@cfsblaw.com
550 West C Street, Suite 2000
San Diego, California 92101
Telephone:  (619) 241-4810
Facsimile:   (619) 955-5318

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Betty Guzman, on behalf of herself and all others similarly situated,<br><br>                    Plaintiff,<br><br>    vs.<br><br>Bridgepoint Education, Inc.; Ashford University; and University of the Rockies,<br><br>                    Defendants. | Case: 11cv0069 WQH (WVG)<br><br>**First Amended Class Action Complaint for:**<br><br>1.  Violation of Business & Professions Code § 17200;<br><br>2.  Violation of Business & Professions Code § 17500;<br><br>3.  Violation of the Consumer Legal Remedies Act;<br><br>4.  Violation of Civil Code § 1710(3); and<br><br>5.  Negligent Misrepresentation<br><br>**Jury Trial Demanded** |

# TABLE OF CONTENTS

I.      SUMMARY OF THE ACTION ...................................................... 1

    A.    To Induce Students to Enroll, Defendants Systematically
    Conceal Material Information and Disseminate
    Misrepresentations ................................................................ 1

    B.    Defendants Pressured Enrollment Advisors to Employ
    Illegal Recruiting Tactics ....................................................... 3

    C.    Defendants Mislead Plaintiff and the Class on Federal
    Student Loans ........................................................................ 4

    D.    Defendants Exploit Federal Education Funding for
    Veterans ................................................................................ 6

II.     JURISDICTION AND VENUE ..................................................... 7

III.    PARTIES ..................................................................................... 7

    A.    Plaintiff ................................................................................. 7

    B.    Defendants ............................................................................ 8

IV.     FACTUAL ALLEGATIONS ......................................................... 9

    A.    Bridgepoint's Marketing Strategy Is Built on
    Misrepresentations ................................................................ 9

        (1)    On Their Web Sites, Defendants Improperly Hide
        Information from Prospective Students ................................... 11

        (2)    Defendants Misrepresent the True Cost of
        Attending Ashford and The Rockies ...................................... 12

        (3)    Bridgepoint Misrepresents the Quality and
        Reputation of Its Academic Programs, Its Job
        Placement Rate, and Its Students' Post-Graduate
        Employability ....................................................................... 15

        (4)    Bridgepoint Employs Misleading Tactics
        Regarding Federal Tuition Assistance .................................... 18

    B.    Defendants Target Veterans .................................................. 20

C.   Bridgepoint Implements an Illegal Incentive
Compensation Scheme and Pressure Its Enrollment
Advisors to Employ Illegal Recruiting Tactics ...................................23

D.   The Government Accountability Office Exposes
Industry-Wide For-Profit College Misfeasance..................................25

V.   CLASS ALLEGATIONS ...............................................................................27

VI.   EQUITABLE TOLLING ALLEGATIONS ..................................................30

VII.   CAUSES OF ACTION ..................................................................................31

First Claim for Relief – Violation of Business & Professions
Code § 17200.....................................................................................................31

Second Claim for Relief – Violation of Business & Professions
Code § 17500 *et seq.* .......................................................................................33

Third Claim for Relief – Violation of the Consumer Legal
Remedies Act ....................................................................................................34

Fourth Claim for Relief – Violation of Civil Code § 1710(3) .......................35

Fifth Claim for Relief – Negligent Misrepresentation ..................................36

VIII.   PRAYER FOR RELIEF ................................................................................37

DEMAND FOR JURY TRIAL .............................................................................38

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1.     Plaintiff Betty Guzman brings this action as a class action on behalf of a nationwide class of plaintiffs (the "Class"), composed of all persons who enrolled in and/or attended classes at either of the two academic institutions operated by Bridgepoint Education, Inc. ("Bridgepoint" or the "Company") – Ashford University ("Ashford") or University of the Rockies ("The Rockies") – during the period approximately from March 1, 2005 through the present (the "Class Period"), for violations of California's consumer protection statutes and common law.  In support of her claims, Plaintiff alleges as follows:

## I.     SUMMARY OF THE ACTION

2.     Bridgepoint is a for-profit higher education company headquartered in San Diego, California.  The Company owns and operates two academic institutions, Ashford and The Rockies, which offer Associate, Bachelor's, Master's and Doctoral programs primarily online, although Ashford also maintains campuses in Clinton, Iowa, and The Rockies in Colorado Springs, Colorado.

### A.     To Induce Students to Enroll, Defendants Systemically Conceal Material Information and Disseminate Misrepresentations

3.     Bridgepoint engaged in a pattern of improper and unlawful conduct in order to recruit students and over-charge the federal government for federal financial aid throughout the Class Period.  The Defendants exploited Plaintiff and all members of the Class, through the use of standardized, misleading recruitment tactics, including the following:

- Defendants hid federally-required disclosures from prospective students on Defendants' Web sites, and enrolled students before disclosing material information to them, in violation of Title IV of

the Higher Education Act of 1965 ("Title IV") and the California
Private Postsecondary Education Act of 2009 (the "CPPEA");

- Defendants misrepresented the true cost of attendance by falsely claiming that Ashford and The Rockies provide "some of the lowest cost tuition programs available," quoting to prospective students false and misleading tuition rates for degree programs, and failing to disclose substantial non-tuition costs such as administrative fees;

- Defendants misrepresented the quality of academic instruction;

- Defendants misrepresented The Rockies' accreditation with the American Psychological Association ("APA") and ability to qualify students to obtain professional psychology licensure;

- Defendants misrepresented students' post-graduation employability and earnings potential.

4.      Defendants made these uniform material misrepresentations in three ways:  (a) through standardized written materials (including on the schools' Web sites) that were available and/or given to all Class members; (b) through uniform scripted oral misrepresentations made by the schools' enrollment advisors; and (c) through material omissions of information that Defendants had a duty to disclose, and on which Class members relied in deciding to enroll at Ashford or The Rockies.

5.      Plaintiff and other Class members relied on these misrepresentations when deciding to enroll, because they were misled to believe that Defendants will provide a quality education at an affordable price, and that they will graduate with a degree that qualifies them for professional licensure and/or for high paying employment in their chosen profession.  Instead, students pay some of the highest tuition rates in the country, are unwittingly placed in courses that are

irrelevant to their stated concentration, receive low quality instruction from under-qualified teachers who, among other things, improperly award grades for assignments that have not even been completed, and graduate with a degree that neither qualifies them to obtain the professional licensing that Defendants led them to believe they would obtain nor qualifies them for any job placement other than low-wage, low-skill employment.

6. Defendants systematically make these misrepresentations to prospective and enrolled students for one reason: to recruit and enroll as many students as possible in order to profit as much as possible, regardless of the students' best interests.

### B. Defendants Pressured Enrollment Advisors to Employ Illegal Recruiting Tactics

7. Defendants' exploitive purpose is achieved in part through Bridgepoint's improper and unlawful practice of setting enrollment quotas for its enrollment advisors, financially rewarding enrollment advisors who outperform these quotas, and disciplining and/or terminating advisors who fail to reach these quotas. Defendants require enrollment advisors and their supervisors to chart their enrollment efforts and track the number of students they enroll and new referral leads they generate in each six month period.  Defendants then award advisors on teams that enroll more students with prizes, cash bonuses and rapid promotion – in direct violation of Title IV's prohibition against providing incentive-based compensation for meeting enrollment quotas.  Defendants reprimand advisors on teams that enroll fewer students.  Advisors that enroll fewer students are, in many cases, terminated.  Managements' sole concern throughout this process is to increase enrollment and retention numbers to serve the ultimate goal of maximizing Bridgepoint's profits.  Defendant's policies and practices demonstrate that providing accurate information to prospective students,

honoring the desires of prospective students, or working in these individuals' best interest is of "no concern at all."

8.     Bridgepoint enrollment advisors are familiar with the refrain that "applications save your seat, retention gets you paid" and have been harshly disciplined or even terminated when they fail to meet their quotas for enrolling prospective students.

9.     Defendants created and fostered a high pressure environment for enrollment advisors and, in turn, encouraged them to employ boiler-room pressure tactics on and disseminate uniform misrepresentations to prospective students.

### C.     Defendants Mislead Plaintiff and the Class on Federal Student Loans

10.     In addition to implementing deceptive tactics to induce prospective students into enrolling, Defendants also misleadingly encourage students to apply for federal financial aid in the form of student loans that Defendants knows students do not necessarily need nor necessarily can repay.  These tactics include, for example:

- pressuring students to apply for the maximum allowable amount of federal financial aid, even when it exceeds the cost of attendance; and

- failing to disclose that students must begin repaying their loans immediately upon enrollment – rather than upon completion of the degree, as is standard for federal student loans.

11.     Defendants also fail to inform prospective students of the material fact that their Cohort Default Rates – the percentage of students who default on their students loans - are significantly higher than average.  For example,

Bridgepoint reported in its 2009 Form 10-K filed with the U.S. Securities and Exchange Commission that the Cohort Default Rate for Ashford in 2008 (the latest year for which data is available) was 13.3%, nearly double the average student loan default rate of 7.0%. The Department of Education projected an unofficial Cohort Default Rate for Ashford as high as 17.4% for 2008, two and a half times the nationwide average. Defendants' omissions of Cohort Default Rates is material because high student default rates are a leading indicator that graduates cannot repay their loans, whether because their education did not adequately prepare or qualify them for employment, because their degrees only allow them to secure low-wage jobs, or because their schools' tuition rates are excessive in relation to the schools' value in helping graduates find gainful employment.

12.     Plaintiff and the other Class members relied on these material misrepresentations and omissions regarding federal financial aid when enrolling at Ashford or The Rockies because they would not have enrolled had they known they would be responsible for paying back more loans than necessary to finance their education, that they would be responsible for immediately repaying their loans upon enrollment, and that Bridgepoint students' federal loan default rate was twice the national average.

13.     Despite the high rates of default, Defendants profit because federal student loans are fully guaranteed by the federal government, so that Bridgepoint gets paid regardless of its students' ability to repay loans. In other words, Bridgepoint's business model relies almost entirely on securing funding from the federal government through misleading and deceptive tactics, selling a product that essentially ensures that a significant number of the students who must repay the loans will be unable to do so, and profiting at the expense of the students, the federal government and, by extension, the American taxpayer.

### D.      Defendants Exploit Federal Education Funding for Veterans

14.      Bridgepoint is motivated to make these misrepresentations to induce prospective students to apply for federal student loans in maximum allowable amounts, in part because Bridgepoint can derive up to 90% of its total revenues from federal funding.  Title IV allows for-profit universities to secure all but ten percent of their total funding from the federal government, including federal student loan money, a requirement known as the "90/10" rule.  Defendants' executives are aware of this ceiling and discuss ways in which to reach the 90% maximum, including by pressuring students to "max out their federal loans."

15.      Defendants also specifically target active military and military veterans for their misleading recruitment practices to capture additional profits. The money Bridgepoint receives from veterans, largely via federal tuition assistance programs, such as the Post-9/11 GI Bill, does not count towards the 90% cap, even though it is federal money.  Defendants exploit veterans and active military to end-run the 90/10 rule, all in the name of profit.

16.      Bridgepoint devotes significant energies to this end-run of the 90/10 rule by dedicating divisions of its enrollment advisors to focus on military recruitment.  Bridgepoint sends these divisions to bases to recruit active duty personnel and veterans in person.  These advisors are trained to engage in the same misleading practices to recruit and enroll as many students as possible, without regard for the recruits' best interests.

17.      Defendants' deceptive, illegal practices ruined the lives of tens of thousands of students, including Plaintiff and other Class members, and harmed the federal treasury.  Yet Bridgepoint and its CEO have profited handsomely from their wrongdoing: last year Bridgepoint CEO Andrew Clark earned more than $20 million.

## II.     JURISICTION AND VENUE

18.     Jurisdiction is proper pursuant to 28 U.S.C. § 1332(d)(2)(A), because this is a class action in which minimal diversity exists, and the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs.

19.     The amount in controversy, exclusive of interest and costs, exceeds the jurisdictional minimum of this Court.

20.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(2) because Defendant Bridgepoint Education, Inc. is headquartered and maintains its principal place of business in this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and Defendant Bridgepoint Education, Inc. has received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## III.    PARTIES

### A.     Plaintiff

21.     Plaintiff Betty Guzman is a citizen and resident of Indiana.  She enrolled in online courses with Ashford in 2006 after speaking with an online enrollment advisor and being exposed to Bridgepoint's false advertisement and statements regarding, among other things, the tuitions and costs, federal financial aid, quality of education, accreditation, and post-enrollment employment prospects.  Ms. Guzman succumbed to Bridgepoint's high pressure recruiting tactics, and relied on Bridgepoint's false advertisement and misstatements before deciding to enroll at Ashford.  Ms. Guzman completed approximately 20 online courses.  Ashford alleges that she owes them over $3,600, and refuses to issue her diploma and release her transcripts.

**B.    Defendants**

22.    Defendant Bridgepoint was founded in 2004 as a Delaware corporation with its company headquarters at 13500 Evening Creek Drive North, Suite 600, San Diego, California 92128.  In 2005, Bridgepoint purchased The Franciscan University of the Prairies, then a non-profit campus-only college in Iowa, then renamed it Ashford University, and converted it into a for-profit online school.  Bridgepoint next purchased the non-profit campus-only Colorado School of Professional Psychology, then renamed it University of the Rockies, and converted it into a for-profit online school.  Bridgepoint hires all employees for both academic institutions, and maintains small campuses in Clinton, Iowa (Ashford) and Colorado Springs, Colorado (The Rockies).  Bridgepoint held an initial public offering on April 14, 2009, and is one of the largest publicly-traded for-profit college companies in the United States.  Upon information and belief, Bridgepoint is a citizen of Delaware and California.

23.    Defendant Ashford University is an academic entity founded by Bridgepoint in March 2005 to run the college formerly known as The Franciscan University of the Prairies, founded in 1918.  Ashford maintains a small campus in Clinton, Iowa, but 99% of the institution's students are enrolled only in an "online" program.  Upon information and belief, Ashford is a citizen of Iowa.

24.    Defendant University of the Rockies is an academic entity founded by Bridgepoint in September 2007 to run the college formerly known as Colorado School of Professional Psychology.  The Rockies maintains a small campus in Colorado Springs, Colorado, but 99% of the institution's students are enrolled only in an "online" program.  Upon information and belief, The Rockies is a citizen of Colorado.

## IV.   FACTUAL ALLEGATIONS

25.   Bridgepoint, a for-profit higher education company, owns and operates Ashford and The Rockies, offering Associate's, Bachelor's, Master's and Doctoral degree programs, primarily online.  As of December 31, 2009, Bridgepoint had more than 5,800 employees.

26.   As of June 30, 2010, the Company had 67,744 students enrolled in its institutions, 99% of whom were attending classes exclusively online.  The Company purports to offer approximately 1,200 courses and 70 degree programs with 130 concentrations and specializations.

27.   The Company has experienced skyrocketing student enrollment at its universities.  Total student enrollment at Ashford and The Rockies increased 115.4% to 42,025 students at March 31, 2009, compared with 19,509 students at the end of the first quarter of 2008.  New student enrollment for the first quarter of 2009 at Bridgepoint's academic institutions was approximately 16,800, an increase of 90.9%, compared with new enrollments of approximately 8,800 for the first quarter of 2008.

28.   Bridgepoint's explosive enrollment growth at its online academic institutions is a direct result of misleading marketing tactics designed to recruit students to attend its schools, and its implementation of federally-prohibited employee incentive programs that were designed to encourage "enrollment advisors" to recruit as many students as possible.

### A.   Bridgepoint's Marketing Strategy Is Built on Misrepresentations

29.   Bridgepoint recklessly or negligently employs misrepresentative marketing tactics designed to entice prospective students to enroll at its universities and apply for federal loans they do not need and cannot pay back. Specifically, Bridgepoint hides information from prospective students on its Web sites, and misleads students by affirmative misrepresentations or material

omissions regarding the true cost of attending its universities, the quality of academic instruction, students' post-graduation employability, and students' needs for federal student loans and their repayment obligations. These tactics are designed to sign up as many students as possible, and to sign up students for as much federal loan money as possible, all in order to maximize Bridgepoint's profits at the expense of its students, the federal government, and the American taxpayer.

30. Ms. Guzman is one of the tens of thousands of students who fell victim to Bridgepoint's systemic false advertisement, dissemination of misstatements, and boiler-room pressure recruiting tactics. Ms. Guzman's initial contact with Bridgepoint started through the Internet. In the one-month period before her enrollment at Ashford in 2006, a Bridgepoint enrollment advisor used high-pressure sales tactics on her by calling her several times a week. During that period, the Bridgepoint enrollment advisor made numerous misrepresentations to Ms. Guzman, including:

- Bridgepoint schools offered the most affordable education to students, and the tuition and costs were the "lowest" and could not be found elsewhere;
- Federal financial aid would cover all tuition, books, fees, and other costs, including costs for purchasing computers and software;
- The need to enroll as soon as possible and to apply for maximum financial aid was urgent;
- Bridgepoint schools are fully accredited, and all credits awarded by Bridgepoint schools are transferable to other higher education institutions; and

- A high percentage of Bridgepoint graduates found jobs in their fields of studies immediately following graduation, and earned tens of thousands of dollars in annual income.

31.    These statements are lies.  Yet these statements are part of the uniform script designed by Bridgepoint, and used by all Bridgepoint enrollment advisors during their communications with prospective students.

32.    These statements and other misrepresentations appear on Bridgepoint's Web site and other advertising vehicles, which are set forth in detail below.

### (1)    On Their Web Sites, Defendants Improperly Hide Information from Prospective Students

33.    Federal law requires educational institutions that receive Title IV funds from the federal government to "make certain information readily available to enrolled and prospective students.  Institutions may satisfy their disclosure requirements by posting the information on their Internet Web sites.  Information to be provided includes:  tuition, fees, and other estimated costs; the institution's refund policy; the requirements and procedures for withdrawing from the institution; a summary of the requirements for the return of Title IV grant or loan assistance funds; the institution's accreditation information:  and the institution's completion or graduation rate."  Both federal and California law require academic institutions to make this information readily available to prospective students *before* they enroll in any program.

34.    Prospective Ashford or The Rockies students obtain information about the schools before enrolling primarily by accessing the schools' Web sites. But Defendants employ a sophisticated – and misleading – tactic in displaying information on their Web sites.  When prospective students enter the search terms "Ashford University" or "University of the Rockies" into an internet search

engine, the first several search results direct individuals to a streamlined, basic site that offers vague and misleading praise for the university and an option to enroll online.  A student who tries to find specific information on either site, including the information required by federal disclosure law, are directed only to an option to complete an online enrollment form, in violation of federal and California law.  Although more comprehensive Web sites exist for both schools, they cannot be easily accessed by prospective students without previously knowing the exact web addresses.

35.     Like other Class members, Ms. Guzman frequently accessed Bridgepoint's Web site, and relied on the misrepresentations made on the Web site in deciding to enroll at Bridgepoint.

### (2)    Defendants Misrepresent the True Cost of Attending Ashford and The Rockies

36.     Defendants uniformly misrepresent the true cost of attending Ashford and The Rockies to all potential and enrolled students.  In particular, Defendants misrepresent to potential and enrolled students that Ashford and The Rockies offer some of the lowest tuition, most affordable degree programs available when in fact they offer among the highest cost, least affordable degree programs.

37.     For instance, Ashford's Web site claims that the school represents "higher education made affordable . . . You deserve a quality education at an affordable price . . . You'll find Ashford University, founded in 1918, is an ideal choice for you as a working adult or someone with an uncompleted degree because Ashford is affordable:  *benefit from one of the lowest program costs.*" The Web site's "Military Benefits" page also claims that Ashford "offers one of the lowest tuition costs available" without specifying anywhere on its enrollment site the actual cost of attendance.

38.     In reality, Ashford's undergraduate tuition rates are among the highest in the country, at $372 per credit hour.  The U.S. Department of Veterans Affairs (the "VA") publishes an annual table listing the state-by-state rates for "the highest in-state, undergraduate, public tuition" in each state in the country. In determining which schools are the most expensive, the VA explains that "all undergraduate program costs were taken into consideration to determine the highest in-state maximum tuition per credit hour and the maximum fees per term. These figures may include program tuition for high cost programs such as flight courses taken as part of a degree requirement or undergraduate pharmacy, nursing and engineering degrees."  In other words, the VA's table lists the costs to attend the most expensive public colleges in each state and territory in the country.  In the last updated table, published August 30, 2010, 28 states' most expensive public colleges charged less than Ashford's $372 per credit hour.  Ashford University charges more tuition per credit hour than all of the public colleges and universities in over half of the states in the entire nation, despite its claims to the contrary.

39.     For students in many states the most expensive  public school alternatives cost less than half of what Ashford charges in tuition:

| State/Territory | Maximum In-State Tuition Rate | Percentage of Ashford's Cost |
|---|---|---|
| Alaska | $170 | 46% |
| Arkansas | $210 | 56% |
| Montana | $205 | 55% |
| Nebraska | $251 | 67% |
| Nevada | $156 | 42% |
| New Mexico | $229 | 62% |
| Oklahoma | $188 | 50% |

| State/Territory | Maximum In-State Tuition Rate | Percentage of Ashford's Cost |
|---|---|---|
| Puerto Rico | $90 | 24% |
| South Dakota | $99 | 27% |
| Utah | $238 | 64% |
| Virgin Islands | $125 | 34% |
| Wyoming | $99 | 27% |

40.     Defendants' claim that Ashford offers one of the most affordable college educations for students is just not true.  The harsh reality is that an Ashford student who completes their undergraduate degree with the minimum 120 credits will pay nearly $45,000 in tuition alone, not including the outrageous hidden fees, described below.

41.     Tuition at The Rockies is even more expensive, at $682 per credit hour for the school's Master's program and $882 per credit hour for the doctorate degree.  The $882/credit hour charge is far higher than average tuition rates.

42.     The exorbitant costs, coupled with the relative worthlessness of the degree for job placement purposes, make Bridgepoint's statements about its institutions' "great value" false and misleading.

43.     In addition to Defendants' written misrepresentations regarding the value of a Bridgepoint education, prospective students are systematically orally misled by Bridgepoint enrollment advisors, who misrepresent the true cost of attendance through scripts provided by Bridgepoint.  Enrollment advisors' misleading claims that Ashford offers "one of the cheapest undergraduate degree programs in the country" induce students to enroll and to stay enrolled.

44.     Enrollment advisors, pressured to enroll every potential student to maximize profit so they can keep their jobs, misrepresent the total cost of attendance at Bridgepoint's schools by quoting to prospective students tuition

rates for nine months of attendance when a program actually lasts twelve months, and by quoting only the tuition rates during the enrollment process, while failing to disclose numerous hidden administration fees.  Only after a student has enrolled and promised to attend and pay for classes does s/he become aware of the following fees:

| Fee | Cost at Ashford | Cost at Rockies |
|---|---|---|
| Technology Service Fee | $1,290 | $250 |
| Sponsored Professional Training Assessment (per credit hr) | $30 | N/A |
| Prior Learning Assessment Experiential Learning Essay Assessment (per course) | $125 | N/A |
| Books and Materials (per course) | $100 | $200 |
| Graduation Fee | $110 | $500 |
| Education Partnership Fee | $30 | N/A |
| **TOTAL** (based on a min. 120 credit hrs for undergraduate degree at Ashford; 68 credit hrs. for doctoral degree at The Rockies) | **$14,030** | **$5,350** |

45.     Like other Class members, Ms. Guzman was never informed of the true costs of her enrollment, and was misled to believe that Bridgepoint would provide affordable education.

**(3)     Bridgepoint Misrepresents the Quality and Reputation of Its Academic Programs, Its Job Placement Rate, and Its Students' Post-Graduate Employability**

46.     Defendants also make uniform written and scripted oral misrepresentations about the quality, reputation, and marketability of the education earned through the academic programs.

47.     Ashford's and The Rockie's Web sites both state the following in the "Frequently Asked Questions" section of their respective sites:

> How does my degree compare to degrees from other schools?
>
> Your degree from Ashford University/University of the Rockies is equally valuable, accepted, and honorable as any equivalent degree you could earn from another accredited school or university, whether on a traditional campus or online.  The only difference between a degree from Ashford University/University of the Rockies and a degree from another school is the money and time you'll save through Ashford University/University of the Rockies.

48.     This statement is false and misleading for at least two reasons.  First, it misleadingly suggests to prospective students that degrees from one of Bridgepoint's academic institutions are somehow of "equal value" as all other accredited schools or universities.  Second, this statement misleadingly suggests that degrees from Ashford or The Rockies will be recognized as valid by potential employers or other academic institutions that recognize degrees from other accredited schools and universities.  This is not so.  Many universities will not accept any transfer credits from any online universities, nor will they recognize an undergraduate degree from an online university as satisfying the academic prerequisites for admission to a graduate or professional degree program.  Additionally, many employers specifically do not recognize degrees from online institutions as proof that a prospective employee qualifies for a certain position, whereas the same employer will recognize an identically titled degree from a traditional campus as proof of qualification.

49.     For example, The Rockies offers certificate programs, master's degrees, and doctorate degrees in psychology.  In order to practice psychology in any state or with the military, one must possess both a relevant degree in psychology and a professional license from the jurisdiction where the student wishes to practice.  However, The Rockies does not offer any degree programs that are recognized as relevant academic degrees by states or the military, nor are

they intended to prepare students for professional licensure.  Although the school makes misrepresentations to the contrary when procuring students, The Rockies admits in the fine print of its program enrollment form that "this program is not intended to prepare students for professional licensure or certification in any field, regardless of concentration."

50.    Even though the Rockies knows its degrees are of almost no value for students planning to become a licensed psychologist, school President Carlita Shelton misleadingly states on the home page of the school's Web site that *"the University's goal is to provide a professional graduate education in psychology to individuals who seek licensure as psychologists."*  This statement is false and misleading, because, by the school's own admission elsewhere, the programs are not intended to prepare students for professional licensure.

51.    Bridgepoint's enrollment advisors make uniform scripted oral misrepresentations about the quality and reputation of its schools, describing them as great schools with amazing professors who offer individualized attention to students.  These advisors explain to prospective students, following scripts from Bridgepoint, that a degree from Ashford or The Rockies will prepare them and qualify them for a number of professional occupations, and claim that the degree will provide them with a competitive advantage over graduates from other schools.  These statements are false and misleading, because the quality of instruction at the online universities is uniformly substandard, the instructors are far less qualified than professors from supposedly comparable universities, and degrees from these schools actually place graduates at a competitive disadvantage, considering that many employers refuse to even recognize the validity of the degrees.

52.    For example, many classes offered by The Rockies are taught by graduate students rather than professors or licensed practitioners, and, on more

than one occasion, students in these purportedly graduate level classes were preemptively awarded "A" grades for assignments they had not completed.  In at least one instance, a professor told students in person that his wife graded many of his students' papers.  Moreover, the highly-advertised residency program was run entirely by graduate students, and not a single professor running the residency program even held a doctorate degree.

53.    Students seeking to transfer, or seeking employment, learn the negligible value of their degree.  One student who completed one year of a purported doctoral program submitted their transcript, with a 4.00 grade point average, to outside psychology professionals and to representatives of the U.S. Navy's psychology program.  The Navy refused even to look at the transcript, explaining that any online degree that was not accredited by the American Psychological Association (APA) was unacceptable for any psychology position with the U.S. military.  Civilian professionals stated that the student would have to begin the psychology degree program again at an APA accredited institution.

54.    Like other Class members, Ms. Guzman was misled to believe that she could easily find employment in her field of study in which she would earn an annual salary of tens of thousands of dollars.

### (4)    Bridgepoint Employs Misleading Tactics Regarding Federal Tuition Assistance

55.    Defendants have an incentive to induce prospective students to apply for the maximum dollar amount of federal loans possible, because Bridgepoint can accept up to 90% of its funding from the federal government's loan programs, because the loans are disbursed directly to the school, and because the loans are completely guaranteed by the federal government.  Defendants are motivated solely by profit to create and implement uniformly misrepresentative advertising and enrollment practices and policies to induce prospective and enrolled students

to apply for federal student loans that they do not need, may not be able to repay, and for which they would not have applied but for Defendants' misrepresentations.

56. For example, Bridgepoint employees improperly pressure prospective students to enroll before completing their financial aid applications, pursuant to uniform written scripts and training Defendants provided to enrollment advisors. Once enrolled, Bridgepoint completes and submits the financial aid applications on the students' behalf, requesting the maximum allowable amount even if the amount exceeds the students' needs. During this process, enrollment advisors also fail to tell prospective students that the loans are disbursed directly to the school and not the individual, thus creating an opportunity for the Defendants to demand payment immediately upon enrollment rather than allowing students to defer payment until after graduation.

57. Bridgepoint also expects enrollment advisors to mislead prospective students regarding how much of their degree program will be covered by federal financial assistance. In at least one instance, an enrollment manager sought to enroll a student who expressed reluctance because of the length of time it would take to graduate. This manager suggested that the student enroll and take twice the course load to graduate in half the time, but the manager did not disclose that only half of these classes could be paid for through federal financial aid and that the student would have to pay the rest out of pocket, even though the manager knew the student could not afford to do so. The manager successfully induced the prospective student to enroll as a result of this misrepresentation.

58. Like other Class members, Ms. Guzman was misled to believe that (a) federal student loans would cover all the costs and tuition for her enrollment at Bridgepiont; and (b) she must apply for the maximum amount of federal student loans, and must enroll as soon as possible.

## B.      Defendants Target Veterans

59.      Bridgepoint specifically targets veterans and active duty military personnel for enrollment, employing the same misrepresentative marketing practices described above, in a deplorable attempt to maintain Title IV standing while it is end-running the 90/10 rule.  Bridgepoint has been successful in this perverse endeavor so far, and receives billions of dollars from the federal government in federal tuition assistance.  In fact, Bridgepoint focuses divisions of enrollment advisors on the purpose of recruiting active military personnel and military veterans.  These divisions often are composed of veterans who go directly to military bases to recruit service members.

60.      Bridgepoint's motivation is transparent.  In order to maintain its Title IV standing, Bridgepoint must derive no less than 10% of its revenues from sources other than Title IV funds and certain other federal programs.  However, the money Bridgepoint and other for-profit universities receive from veterans via the Post-9/11 GI Bill does not count towards the 90% limit these schools can receive in federal funding.  Thus, Bridgepoint can collect unlimited money from the federal government via the Post-9/11 GI Bill and still maintain its Title IV standing for purposes of receiving federal student aid.

61.      As Iowa Senator Tom Harkin explained on December 9, 2010, this end-run by for-profit universities to receive unlimited federal money has "unintentionally subjected misleading marketing campaigns, educational programs far more expensive than comparable public or non-profit programs, and a lack of needed services."

62.      Bloomberg News recently reported that twenty for-profit colleges "reaped $521 million un U.S. taxpayer funds in 2010, seven times more than in 2006, by recruiting armed-services members and veterans through misleading marketing," noting that "Bridgepoint Education, Inc., based in San Diego,

ranked second [in receiving tuition assistance from the Defense Department] with $41.2 million." Bloomberg News, "For-Profit Colleges Scam Military for $521 Million, Report Says," December 9, 2010.

63. The Bloomberg News article explained the motivation behind Bridgepoint's increasing the focus of their misleading marketing campaigns on the military:

> Getting the money from military personnel helped the companies circumvent a cap on the aid they can receive from the Education Department, their main source of income, according to the report from Iowa Democrat Tom Harkin, chairman of the Senate Health, Education, Labor and Pensions committee. Congress should protect veterans and taxpayers from documented abuses by those colleges, the report's authors said.

> The Post 9/11 GI Bill, which Congress passed in 2008, raised educational benefits for almost all military veterans, and in some cases allowed them to pass money for school to spouses and children, according to the report. The colleges made it a priority to recruit military members to exploit the surge in benefits, the authors said.

> "New Tool"

> A 1992 law allows for-profit colleges to get as much as 90 percent of their revenue from federal financial aid. The companies seek military students and veterans because their education benefits are counted as a non-government source, according to the Harkin report.

64. Defendants' profiteering is at the expense of its military and veteran students. Active military and military veterans who Defendants misled into enrolling have dropped out and defaulted on loans at a much higher rate than veterans at non-profit colleges:

> Dropout Rates

> Statistics suggest that the for-profit colleges attended by military members have high dropout rates and poor educational results, according to the report. At 4 of the 5 for-profit colleges receiving the most in Post-9/11 GI

Bill funding, loan repayment rates were below 37 percent, according to the report.

At the same 4 schools, 24 percent of the students defaulted on their loans, according to the report. The national rate of student default on government loans was 7 percent in the academic year ended 2008, the most recent period for which data are available, according to the Education Department.

65.     In addition to subjecting military students to the same misrepresentations and material omissions as civilian students, Bridgepoint engages in a number of misleading practices aimed directly at veterans who are considering enrolling. For example, Ashford's enrollment Web site includes a page entitled "Military Benefits." On this page, Ashford claims to "offer[] one of the lowest tuition costs available" without specifying anywhere on its enrollment site the actual cost of attendance. However, as shown above, Ashford's tuition rates are among the highest in the country at $372 per credit hour. The VA, which administers the Post-9/11 GI Bill, publishes an annual table on its Web site containing the state-by-state maximum dollar amount of tuition and fees that the Post-9/11 GI Bill and other veteran education assistance programs will cover. As the site explains, these maximums are set "in accordance with the VA's statutory requirement to determine the highest in-state, undergraduate, public tuition." In other words, the VA's table lists the costs to attend the most expensive public colleges in each state of the country. In the last updated table, published August 30, 2010, 28 states' most expensive public colleges charged less than $372 per credit hour. Ashford, which claims to offer veterans "one of the lowest tuition costs available," charges more tuition per credit hour than each of the public colleges and universities in 56% of the states in the entire nation.

66.     The variance between the VA's published maximum rates and Ashford's rates has a particularly important impact on veterans. The Post-9/11 GI Bill will only pay for tuition costs up to the VA's published maximum charge

in a given state.  Ashford's "lowest tuition costs" are financially-paralyzing for veterans in 28 states where the VA's generous benefits are not enough to cover the unreasonably high costs of attending Ashford.

67.    The result is that Defendants encourage veterans, who otherwise should never have been forced to take out loans to finance their postsecondary education, to apply for loans or to pay the difference out of pocket, such that military personnel and veterans often end up with far more debt than they can pay back or than was necessary.  The Wall Street Journal observed that student loan default rates among veterans at for-profit institutions are much higher than for veterans at comparable public or non-profit schools.  If Defendants had not misled those who served our country into attending such expensive and low-quality institutions, these students likely would have never attended Ashford or The Rockies, never taken out a loan, and would have graduated from a more reputable college without debt.

### C.    Bridgeport Implements an Illegal Incentive Compensation Scheme and Pressure Its Enrollment Advisors to Employ Illegal Recruiting Tactics

68.    Title IV education programs prohibit Defendants from providing incentive payments to employees for securing student enrollment.  However, Bridgepoint provides incentive payments to its enrollment advisors for recruiting and securing student enrollment, and fosters a competitive environment such that an enrollment advisor's success or failure is determined by the number of prospective students the advisor actually enrolls.   The result of these perverse incentives is that enrollment advisors give false and misleading information to get students to enroll, and also agree to enroll prospective students even when it is obvious that the prospective student did not qualify or would not benefit from the program.

69.     Bridgepoint's hundreds of enrollment advisors work in large call centers and are divided into teams.  The highest performing teams - determined solely by number of students enrolled - win prizes and often receive substantial raises.  Underperforming team members do not receive bonuses or pay raises, and often are fired for failure to enroll more students.  This type of hypercompetitive atmosphere fosters a culture in which misrepresentations are encouraged in order to drive up enrollment numbers, and violates federal law.

70.     Bridgepoint enrollment advisors are required to track the number of contacts they make with referrals, prospective students, and enrolled students, as well as the number of students they enroll in six month increments.  Bridgepoint requires its enrollment advisors to maintain communication with students they enroll, but only to ensure the students remain enrolled long enough for Bridgepoint to keep the money from their federal student loans.  Bridgepoint requires its enrollment advisors to track recruitment data on charts and individualized New Student Checklists and awards enrollment advisor points based on the number of contacts made and on the number of students enrolled.  Enrollment advisors with the most points earn the most money; those with the fewest points, or who do not meet quotas, are disciplined and/or terminated.  Defendants also track enrollment advisors' recruitment data with detailed periodic reports.

71.     Enrollment advisors that do not enroll enough students received several verbal and written warnings, and learn the refrain "applications save your seat, and retention gets you paid."  Defendants repeatedly warn enrollment advisors in writing that they will be terminated if they do not meet the quotas and goals mandated by Bridgepoint.  These actions are improper and unlawful, as they require an enrollment advisor to submit a number of applications regardless of his/her prospective students" desire to enroll or not.

72.     Under the constant pressure to increase the number of enrollment, Bridgepoint enrollment advisors employ boiler-room tactics, and disseminated false and misleading statements regarding the quality of education, federal student aid, the costs of enrollment, and post-enrollment employment prospects.

73.     Ms. Guzman was a victim of Bridgepoint's illegal recruiting tactics and misrepresentations.

**D.     The Government Accountability Office Exposes Industry-Wide For-Profit College Misfeasance**

74.     In 2009, the federal government instructed the U.S. Government Accountability Office ("GAO") to investigate the practices of for-profit colleges and universities like Bridgepoint for the following reasons:

**a.     Exploding Enrollment**: Enrollment in these colleges has grown far faster in the last decade than at traditional higher-education institutions.  Enrollment in for-profit colleges has grown from about 365,000 students in 2004 to approximately 1.8 million in 2009;

**b.     Growth of Publicly-Traded For-Profit Colleges**: The fourteen largest for-profit corporations (including Bridgepoint), worth $26 billion as of July 2010, enrolled some 1.4 million students in their wholly owned subsidiary for-profit colleges;

**c.     Disproportionate Federal Financial Assistance**: In 2009, students at for-profit colleges  received  more than  $4  billion  in  Pell  Grants  (a federal government student tuition grant) and more than $20 billion in federal loans provided by the Department of Education. This represents roughly 25% of all Federal Pell Grants and federal loans given to college students throughout the country, despite the fact that for-profit college students represent only approximately 9% of all college students; and

**d.     Disproportionate Student Loan Default Rates**: Students at for-profit colleges also represent a vastly disproportionate percentage of students who default on their federally administered student loans.  When a student defaults on a federal loan, the government and the American taxpayer—not the academic institution— must pick up the tab.  In 2009, despite representing only 9% of college students throughout the country,

students at for-profit colleges and universities were responsible for 44% of all student loan defaults in the country.

75.     On August 3, 2010, the GAO issued a report concluding that for-profit educational institutions, like Bridgepoint, engaged in a pattern of behavior where they systematically recruited students through deceptive marketing, harassing recruitment tactics, and prohibited employee incentive programs, all in an attempt to increase student enrollment and drive up company profits.  The GAO report confirmed the systematic nature of the deceptive and unlawful practices described above that are employed by for-profit institutions like Bridgepoint, concluding that they misrepresented to prospective and enrolled students, among other things, the true cost of attending the school, their ability to receive and obligation to repay federal tuition assistance, and their post-graduation employability and salary potential.  The report further confirmed that many of these schools also paid bonuses to enrollment advisors based directly on the numbers of students the advisors enrolled or retained with the school in direct violation of federal law.  The GAO also found that every for-profit institution investigated made deceptive and misleading statements regarding federal financial aid, in a direct effort to secure a students' application for the maximum allowable loan amount under federal guidelines.

76.     The GAO report further concluded that many of these for-profit institutions specifically targeted veterans and active military personnel by offering misleading military benefits plans.  For example, many schools recruited potential students who received tuition assistance under the Post 9/11-GI Bill by claiming to offer military discounts on tuition, when in reality they were charging tuition rates far in excess of what the Post 9/11-GI Bill and other veterans' tuition assistance programs cover.

## V.    CLASS ACTION ALLEGATIONS

77.    Plaintiff brings this action both on behalf of herself and as a class action under F.R.C.P. 23(a) and 23(b) on behalf of the following Class:

> All persons in the United States who enrolled in and/or attended classes offered by Bridgepoint Education, Inc. through either of its two academic institutions, Ashford University or University of the Rockies, during the period from approximately March 1, 2005 through the present (the "Class Period"). Excluded from the class are defendants, defendants' immediate families, subsidiaries, affiliates, successors-in-interest, representatives, trustees, executors, administrators, heirs, assigns or transferees, any person acting on behalf of defendants, all governmental entities, and co-conspirators.

78.    Plaintiff does not know the exact number of Class members because such information is in the exclusive control of Defendants.  Upon information and belief, Plaintiff believes that there are tens of thousands of Class members, geographically dispersed throughout the United States, such that joinder of all Class members is impracticable.

79.    Plaintiff's claims are typical of the claims of the Class in that:

- Plaintiff was enrolled in an online degree program offered by Defendants during the Class Period;

- Plaintiff was induced to enroll in the online degree program by identical affirmative written misrepresentations published by Bridgepoint, uniform scripted affirmative oral misrepresentations made by Bridgepoint enrollment advisors, and through Defendants' material omissions;

- Plaintiff enrolled in online classes offered by Defendants during the Class Period;

- Plaintiff was damaged by the wrongful conduct of Defendants; and

1    •    The relief sought is common to the Class.

2    80.    Questions of law or fact arise from Defendants' unfair and

3    misleading conduct that is common to the Class.  Questions of law or fact

4    common to the Class include are not limited to:

5
6    •    whether Defendants misrepresented material facts about their
     academic institutions to the Class;

7
8    •    whether Defendants misrepresented material facts about federal
     student loan requirements to the Class;

9
10   •    whether Class members were recruited by Defendants to attend one
     of Bridgepoint's academic institutions;

11
12   •    whether Class members enrolled in and/or attended online classes
     offered by Defendants;

13
14   •    whether Defendants improperly provided prohibited incentives to
     their enrollment advisors;

15
16   •    whether Defendants improperly targeted veterans and active duty
     military personnel through misleading marketing practices;

17
18   •    whether Defendants engaged in unfair and/or unlawful business
     practices during the Class Period;

19
20   •    whether Defendants engaged in unfair and/or unlawful marketing
     practices, including false advertising, during the Class Period;

21
22   •    whether Defendants had a duty to disclose material facts to Class
     members;

23
24   •    whether Defendants failed to disclose material facts to Class
     members;

25
26   •    whether Defendants breached the implied covenant of good faith and
     fair dealing implied in student enrollment contracts; and

27

28

- whether class-wide damages, declaratory and/or injunctive relief is appropriate and, if so, the proper measure of the damages, declaratory and/or injunctive relief.

81.   These questions of law or fact are common to the Class, and predominate over any other questions affecting only individual class members.

82.   Plaintiff will fairly and adequately represent the interests of the Class in that:

- Plaintiff is typical of former students of online degree programs offered by Defendants;

- Plaintiff was induced to enroll in an online degree program offered by Defendants through misrepresentations and/or omissions in marketing and/or unfair business practices; and

- Plaintiff has no conflicts with any other member of the Class.

83.   Plaintiff has retained competent counsel, who are experienced in class action litigation.

84.   A class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.

85.   Prosecution of separate actions by individual class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

86.   Injunctive relief is appropriate as to the Class as a whole because Defendants have acted or refused to act on grounds generally applicable to the Class.

87.   Plaintiff reserves the right to expand, modify, or alter the class definition in response to information learned during discovery.

## VI.   EQUITABLE TOLLING ALLEGATIONS

88.   At all relevant times when Defendants induced Plaintiff and members of the Class to enroll at Ashford or The Rockies through misleading misrepresentations and under false pretenses, Defendants concealed relevant facts that would have allowed Plaintiff to discover the false and misleading misrepresentations.  As a result of these misrepresentations, equitable tolling of the statute of limitations applies as to the claims asserted by Plaintiff and the Class.  Any applicable statute of limitations that might otherwise bar certain of the claims at issue should be tolled because Defendants actively misled Plaintiff and the Class with respect to the true cost of attending Bridgepoint's universities, the quality of the academic instruction, students' post-graduation job prospects, employability and earnings potential. The Rockies' accreditation under the APA and ability to qualify graduates for professional psychology licensure, federal student loan repayment options and obligations, and Defendants' students' federal loan repayment rate.

89.   Plaintiff exercised due diligence to discover Defendants' wrongdoing.   However, such wrongdoing was not discoverable prior to the date of the filing of this action since Defendants concealed their wrongdoing through misrepresentation.  Defendants have never publicly disclosed their wrongdoing in making the uniform, Class-wide written and oral misrepresentations and material omissions.  Plaintiff exercised due diligence by promptly filing this Complaint after discovering the facts giving rise to these claims.

## VII.   CAUSES OF ACTION

### First Claim for Relief
### Violation of Business & Professions Code § 17200

90.     Plaintiff realleges and incorporates by reference each and every allegation above as if fully set forth in this claim.

91.     The Unfair Trade Practices Act defines unfair competition to include any "unfair" or "unlawful" business act or practice.  CAL. BUS. & PROF. CODE § 17200.  Unfair competition also includes "unfair, deceptive, untrue or misleading advertising."  *Id.*  The Act also provides for injunctive relief and restitution for violations.  *Id.* § 17203.

92.     Plaintiff brings this cause of action on behalf of herself, members of the Class, and members of the general public pursuant to California Business & Professions Code §§ 17200 *et seq.*  Under Business & Professions Code § 17200 *et seq.*, Plaintiff is entitled to enjoin Defendants' wrongful practices and to obtain restitution for the monies paid to Defendants by reason of Defendants' unlawful and/or unfair acts and practices.

93.     Defendants injured members of the Class and the general public as a direct and proximate result of the acts and practices alleged above.  This Court is empowered to, and should, order restitution to all persons from whom Defendants unfairly and/or unlawfully took money.

94.     Defendants violated Business and Professions Code § 17200 *et seq.* because they breached their contracts with Plaintiff and the Class, breached the implied covenant of good faith and fair dealing, violated the Consumer Legal Remedies Act, violated § 17500, negligently misrepresented facts to Plaintiff and the Class, and violated Title IV.

95.     Defendants further violated Business & Professions Code § 17200 *et seq.*, by their violations of many provisions of the CPPEA.  The CPPEA prohibits private postsecondary institutions from the following conduct:

- Promising or guaranteeing employment, or otherwise overstating the availability of jobs upon graduation (§ 94897(b));
- Advertising concerning job availability, degree of skill, or length of time required to learn a trade or skill unless the information is accurate and not misleading (§ 94897(c));
- Paying any consideration to a person to induce that person to sign an enrollment agreement for an educational program (§ 94897(h));
- Compensating an employee involved in recruitment, enrollment, admissions, student attendance, or sales of educational materials to students on the basis of a commission, commission draw, bonus, quota, or other similar method related to the recruitment, enrollment, admissions, student attendance, or sales of educational materials to students (§ 94897(n)); or
- Requiring a prospective student to provide personal contact information in order to obtain, from the institution's Internet Web site, educational program information that is required to be contained in the school catalog or any information required pursuant to the consumer information requirements of Title IV, and any amendments thereto (§ 94897(o)).

96.     Defendants violated each of these provisions by virtue of their unfair, unlawful, and conduct, described in detail above.

97.     Defendants' unlawful and unfair business acts and practices, as described above, present a continuing threat to members of the Class and of the

general public, in that Defendants will continue, unless enjoined, to commit violations of Business & Professions Code § 17200.  This Court has the authority to, and should, grant preliminary and permanent injunctive relief against these acts and practices.

### Second Claim for Relief
### Violation of Business & Professions Code § 17500 *et seq.*

98.   Plaintiff realleges and incorporates by reference each and every allegation above as if fully set forth in this claim.

99.   California's False Advertising Act makes it unlawful to "make or disseminate or cause to be made or disseminated before the public [a statement] which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading" with the intent to "induce the public to enter into any obligation relating thereto." Such statements include statements made through "any advertising device," including "over the Internet."  BUS. & PROF. CODE § 17500.

100.   This cause of action is brought on behalf of Plaintiff and the Class under Business & Professions Code § 17500 *et seq.*  Plaintiff is entitled to enjoin Defendants' wrongful practices, and to obtain restitution for the monies paid to Defendants by reason of Defendants' unlawful and unfair conduct under the False Advertising Act.

101.   Defendants violated the False Advertising Act by making, disseminating, and/or causing to be made or disseminated, false and misleading statements on their Web sites and other promotional materials about the true cost of attending Bridgepoint's universities, the quality of the academic instruction, students' post-graduation job prospects, employability and earnings potential, and The Rockies' accreditation under the APA and ability to qualify graduates for professional psychology licensure.  These false and misleading statements were

made with the intent to induce the general public, including Plaintiff and the Class, to enroll in Defendants' online degree and certificate programs.

102.   Plaintiff and the Class did in fact rely on these false and misleading statements in deciding to enroll in Defendants' online certificate and degree programs.  As a direct and proximate result of the acts and practices alleged above, members of the Class and the general public who enrolled in and/or attended classes at Ashford or The Rockies have been injured.   This Court has the authority to, and should, order restitution to all persons from whom Defendants unfairly and/or unlawfully took money.

103.   Defendants' unlawful and false and misleading advertising, as described above, presents a continuing threat to members of the Class and of the general public, in that Defendants are continuing, and will continue, unless enjoined, to violate Business & Professions Code § 17500 *et seq.*  This Court has the authority to, and should, grant preliminary and permanent injunctive relief against such conduct.

### Third Claim for Relief
### Violation of the Consumer Legal Remedies Act

104.   Plaintiff realleges and incorporates by reference each and every allegation above as if fully set forth in this claim.

105.   This cause of action is brought on behalf of Plaintiff and the Class under California Civil Code § 1750 *et seq.*   Under the Consumer Legal Remedies Act, Plaintiff is entitled to enjoin Defendants' wrongful practices by reason of Defendants' unlawful and unfair acts and practices.

106.   The Consumer Legal Remedies Act prohibits unfair competition and unfair acts or practices that are undertaken by anyone in a transaction that is intended to result, or which result, in the sale of goods and services.

107.   Defendants violated the Consumer Legal Remedies Act by misrepresenting to Plaintiff and the Class the true cost of attendance at Ashford and The Rockies, by misrepresenting the quality of academic instruction at these schools, by misrepresenting students' post-graduation employability, job placement prospects, and qualification for professional licensure, and by misrepresenting prospective students' federal financial assistance options.

108.   Defendants' unlawful and unfair business acts and practices, and unfair and misleading advertising, as described above, present a continuing threat to Plaintiff, members of the Class and members of the general public, in that Defendants continue to mislead prospective students into enrolling in programs offered by Bridgepoint, in violation of the Consumer Legal Remedies Act.   This Court has the authority to, and should, grant preliminary and permanent injunctive relief against such conduct.

109.   As a result of Defendants' violations of the Consumer Legal Remedies Act, Plaintiff and each member of the Class have suffered damages. Plaintiff seeks an injunction against Defendants' illegal and unfair business practices.

**Fourth Claim for Relief**
**Violation of Civil Code § 1710(3)**

110.   Plaintiff realleges and incorporates by reference each and every allegation above as if fully set forth in this claim.

111.   During the Class Period, Defendants knew, among other things, the following material facts:

- the true costs of enrollment at Bridgepoint schools, including tuitions, fees, and other expenses;
- the refund policy at Bridgepoint schools;

- the requirements and procedures for withdrawing from Bridgepoint schools;
- the accreditation of Bridgepoint schools;
- the completion and graduation rates at Bridgepoint schools;
- the unusually high Cohort Default Rates for Bridgepoint Students; and
- the prospects for Bridgepoint graduates to secure employment in their fields of studies.

112.   During the Class Period, Defendants concealed such material facts from Plaintiff and the Class before they enrolled at Bridgepoint schools, although they were required to disclose such material facts under Title IV, the CPPEA, and other laws and regulations.

113.   By concealing such material facts, Defendants intended to induce Plaintiff and the Class to enroll in Bridgepoint schools.

114.   Plaintiff and the Class were unaware of these concealed facts, and had no means of ascertaining such concealed facts before making a decision to attend and/or continuing their enrollment at Bridgepoint schools.

115.   As a result of Defendants' concealment of these material facts, Plaintiff and the Class have been injured.

**Fifth Claim for Relief**
**Negligent Misrepresentation**

116.   Plaintiff realleges and incorporates by reference each and every allegation above as if fully set forth in this claim.

117.   Defendants made systematic, identical written misrepresentations regarding the cost of attending Ashford and The Rockies, the value of the degree programs offered at these schools, the quality of the schools as compared to other institutions, and students' post-graduation qualification for certain professional

licenses. Defendants had no reasonable grounds for believing these representations to be true when they made them.  Regardless, Defendants made these representations in order to induce Plaintiff and the Class to act in reliance on these representations by enrolling at Ashford or The Rockies, or with the expectation that they would so act.  Plaintiff and each member of the Class relied on these negligent representations before enrolling, and in deciding to enroll.

118.   Plaintiff and the members of the Class were ignorant of the true facts at the time Defendants made the misrepresentations.  Plaintiff and the members of the Class would not have enrolled in Ashford or The Rockies if they had known the true facts.

119.   Plaintiff and members of the Class have been damaged as a proximate result of Defendants' negligent conduct, in an amount in excess of this Court' s jurisdiction, the exact amount to be proven at trial.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the Class Members she seeks to represent in this action, requests the following relief:

a.      A declaration that this action is a proper class action under Federal Rule of Civil Procedure 23 on behalf of the Class as defined herein, and an order directing that reasonable notice of this action be given to each member of the Class;

b.      A declaration that the Defendants' conduct alleged herein constitutes a breach of contract, breach of the implied covenant of good faith and fair dealing, a violation of Business & Professions Code § 17200, a violation of Title IV of the Higher Education Act of 1965, a violation of the CPPEA, a violation of the Consumer Legal Remedies Act, and negligent misrepresentation;

c.      An injunction enjoining Defendant, preliminarily and permanently, from continuing the unlawful conduct alleged herein;

d.      For restitution to Plaintiff and each member of the Class, as his or her interest may appear, of all sums unlawfully collected by Defendants from the Plaintiff and other members of the Class since March 1, 2005 through the present;

e.      For disgorgement of all profits obtained by Defendants as a result of its unfair business practices;

f.      For an award for Plaintiff and the Class for the costs of this suit (including expert fees), and reasonable attorneys' fees, as provided by law; and

g.      For an award for such other and further relief as the nature of this case may require, or as this Court deems just, equitable, and proper.

## DEMAND FOR JURY TRIAL

Under Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all triable issues.

Dated:  January 4, 2012

CHAPIN FITZGERALD
   SULLIVAN & BOTTINI LLP
Edward D. Chapin
Jill M. Sullivan
Francis A. Bottini, Jr.
Douglas J. Brown

s/ Francis A. Bottini, Jr.
Francis A. Bottini, Jr.

550 West C Street, Suite 2000
San Diego, California  92101
Telephone:   (619) 241-4810
Facsimile:   (619) 955-5318

*Attorneys for Plaintiff*