1
2
3
4
5
6
7
8
9

10          **UNITED STATES DISTRICT COURT**

11          **SOUTHERN DISTRICT OF CALIFORNIA**

12

13   BETTY GUZMAN, individually and          Case No. 11-cv-69-BAS(WVG)
     on behalf of all other similarly
     situated,                               **ORDER:**
14
                          Plaintiff,         **(1) GRANTING DEFENDANTS'**
15                                           **MOTION FOR SANCTIONS; AND**
           v.
16                                           **(2) DENYING PLAINTIFF'S**
                                             **MOTION FOR CLASS**
17   BRIDGEPOINT EDUCATION, INC.,            **CERTIFICATION**
     *et al.*,
18                                           **[ECF Nos. 86, 78]**
                          Defendants.
19

20

21          On January 11, 2011, Plaintiff Betty Guzman commenced this class action

22   against Defendants Bridgepoint Education, Inc. ("Bridgepoint"), Ashford University

23   ("Ashford"), and University of the Rockies ("The Rockies"),[1] alleging that Defendants

24   "engaged in a pattern of improper and unlawful conduct in order to recruit students and

25   over-charge the federal government for federal financial aid . . . through the use of

26   standardized, misleading recruitment tactics[.]" (Compl. ¶ 6.)  Plaintiff amended the

27

28          [1] University of the Rockies is no longer a party to this action.  It was dismissed by court order
     on May 30, 2012.

complaint twice, the current operative complaint being the Second Amended Complaint ("SAC").  Now pending before the Court are Defendants' motion for sanctions and Plaintiff's motion for class certification.  Both motions are opposed.

Having reviewed the papers submitted and oral argument from both parties, the Court **GRANTS** Defendants' motion for sanctions (ECF No. 86) and **DENIES** Plaintiff's motion for class certification (ECF No. 78).

## I.      BACKGROUND[2]

Bridgepoint is "one of the largest publicly-traded for-profit college companies in the United States" with more than 5,800 employees.  (SAC ¶¶ 22, 25.)  Ashford is an academic entity founded, owned, and operated by Bridgepoint.  (SAC ¶¶ 23–25.)  It "offer[s] Associate's, Bachelor's, Master's, and Doctoral degree programs, primarily online."  (SAC ¶ 25.)  Though most of Ashford's students are enrolled in the online program, it nonetheless maintains a physical campus in Clinton, Iowa.  (SAC ¶ 23.)  Students take only one online class at a time, each course typically being five weeks in length.  (Ng Dep. 221:12–23.)

According to the complaint, 67,744 students have enrolled in Bridgepoint's institutions, "99% of whom were attending classes exclusively online."  (SAC ¶ 26.)  The total student enrollment at Ashford and The Rockies increased from 19,509 students at the end of the first quarter in 2008 to 42,025 students as of March 31, 2009.  (SAC ¶ 27.)  New student enrollment for the first quarter of 2009 was approximately 16,800 compared to new enrollments of approximately 8,800 for the first quarter of 2008.  (*Id.*)  As of December 31, 2012, over 50,300 students have graduated from the Bridgepoint institutions with students having enrolled from all 50 states, the District of Columbia, and 60 different countries.  (Bridgepoint 10-K (2012) at 5.)

//

---

[2] The following background is based primarily on the SAC and the exhibits attached to Plaintiff's class-certification motion.  The parties are to presume that exhibits referenced in this section are to those attached to the class-certification briefs, unless noted otherwise.

At the heart of this action is Plaintiff's assertion that "Bridgepoint's explosive enrollment growth at its online academic institutions is a direct result of misleading marketing tactics designed to recruit students to attend its schools, and its implementation of federally-prohibited employee incentive programs that were designed to encourage 'enrollment advisors' to recruit as many students as possible." (SAC ¶ 28.)

### A.   Advertising and Marketing

Prior to 2012, Ashford's only national marketing was through third-party "aggregator websites," which are "websites that allow students interested in information regarding post-secondary education to input their information to be sent to a number of universities," including Ashford. (Mignone Decl. ¶ 4; Mignone Dep. 118:10–23.) Currently, however, marketing efforts include digital, print, and television advertising. (Mignone Dep. 109:7–111:12.) Digital advertising composed of "70 to 80 percent" of all advertising with the remaining "20 to 30 percent" consisting of print and television advertising. (*Id.*) Ashford does not use the same messaging across all advertising forms. (*Id.* at 139:8–19.)

Ashford's main website is www.ashford.com. A communications review committee—consisting of "compliance, legal, and other individuals that are part of Ashford University"—vets all content posted on the website. (Mignone Dep. 51:3:–16.) "The marketing content on the current website is . . . different from what was on the website in 2005 because Ashford University has expanded its programs and regularly changes its marketing message." (Mignone Decl. ¶ 5.)

In addition to the main website, Ashford has also used other website addresses, the quantity depending on considerations such as the current "campaign" and site testing. (Mignone Dep. 113:7–23.) Currently, Ashford has three additional websites. (*Id.* at 113:16–114:25.) One of these websites is degrees.ashford.edu, which is a "landing environment for paid search." (*Id.*) In other words, it is a site where

prospective students "simply submit information if they would like to request more information." (*Id.*)    The other two websites are here.ashford.edu and belong.ashford.edu, which are also landing environments associated with current or former advertising campaigns.   (*Id.*)   Students cannot enroll at these landing environments.  (*Id.*)

Ashford also sends representatives to military bases and military conferences to recruit potential students. (Mignone Dep. 142:22–144:12.) It sends representatives to community colleges and conferences to recruit and speak about corporate partnerships, among other things, as well.  (*Id.* at 144:13–25.)  Furthermore, "[o]ftentimes, people may refer friends or family members or people that they work with to attend Ashford University, and that's an important group of inquiries[.]"  (*Id.* at 103:14–24; *see also* Grady Decl. ¶ 10.)

## B. Enrollment Advisors

After Ashford received contact information from aggregator websites, it would have its enrollment advisors follow up. (Mignone Dep. 120:1–9.) Enrollment advisors "provid[e] whatever is necessary to what the student is asking[.]" (Ng Dep. 66:12–19.) Questions typically received from prospective students range "from the specific education they are looking for all the way to normal questions that students ask when they are looking for what is the right college for them[,]" including questions related to costs and programs.  (*Id.* at 67:6–21.)

Enrollment advisors are trained to give "accurate and truthful information" to prospective students.  (Ng Dep. 54:8–55:24.)  As a part of this training, advisors are given written materials including "the content piece for student services" and "conversation guides." (*Id.*)  The purpose of the written materials is so that a newly hired enrollment advisor can first learn "what the content is" and then have "conversation guides to ensure that they are giving students . . . information that's pertinent to that specific student." (*Id.*)  Though all newly hired enrollment advisors

receive training materials, different training materials are given depending on the relevant department.  (*Id.*)  Defendants insist that enrollment advisors are not given scripts.  (*Id.*)

One document provided in the training materials is titled "Ethics of Admissions, which provides nine ethical guidelines for enrollment advisors, including "[a]here[nce] to state and federal Do Not Call regulations," and "[m]aintaining truth and accuracy of all areas of advertisement."  (Young Decl. Ex. 16; *see also* Young Decl. Ex. 17 (document titled "Enrollment Compliance Acknowledgment").)  Elaborating on the latter, the guidelines explicitly state that "[i]t is unacceptable to misrepresent or advise students incorrectly in any area, (i.e. length of time for completion, program content, attendance requirements, certification, technology requirement, PLA, all charges associated with degree program)" and that "[i]t is not permissible to discuss a definitive amount of funds a student may receive in student loans/grants, a definitive amount of transfer credits prior to an unofficial pre-evaluation or employability upon graduation[.]"  (Young Decl. Ex. 16.)

In a document titled "Incorporating Quality Control," presumably from the training materials, Ashford instructed enrollment advisors that "ALL outbound calls must include this verbiage": "Great!  This call may be monitored for quality assurance. So tell me, [prospective student's name], why is getting your degree so important to you (Motivation Question)?"  (Bottini Decl. Ex. 22.)  That document makes clear that "[the verbiage] must happen immediately in the call and within a very short time period.  No later than 60 seconds."  (*Id.*)  The purpose of the verbiage is to prevent the conversation from "get[ting] away from us[,]" which is why enrollment advisors should not ask "How are you, today?" in their introductions.  (*Id.*)  Enrollment advisors are further instructed that their first role is to increase enrollment and achieving that goal may be done if they "Create Urgency" in a "polite, helpful way!"  (Bottini Decl. Ex. 11.)

//

Ashford also provided guides to its enrollment advisors addressing follow-ups and leaving effective messages. (Bottini Decl. Ex. 12.)  In these guides, fields are left open for enrollment advisors to presumably fill out to develop a consistent approach in their own words.  (*Id.*)  For example, in the document titled "Leaving Effective Messages - The Rules," enrollment advisors are told to "[w]rite down 6 [reasons to call you back] and circle 2-3 you might use" to complete the sentence "When you call me back, we will discuss . . . ." (*Id.*)  Example language is also provided throughout this document along with occasional instructions to the enrollment advisor.  (*Id.*)  Some instructions provided state, for example: "Be Persistent!"; "It's important to mix things up a little with your message to avoid sounding like a broken record"; "Spend your time wisely and focus on meeting the students [sic] needs"; and "Slow down and listen to your students." (*Id.*)  Other documents are similar in form including instructions given with example language. (*See, e.g.,* Bottini Decl. Ex. 23.)

Despite the instructions in these guides, a former enrollment advisor at Ashford from August 2009 to January 2011—Ryan Ferguson—states in a declaration that "Ashford pressured enrollment advisors to employ a series of tactics, including making misrepresentations and concealing material information, to induce students to begin enrollment and to remain enrolled." (Ferguson Decl. ¶ 7.)  He continues, "Although Bridgepoint's training materials required 'truth and accuracy in all areas of advisement,' enrollment advisors were pressured to say anything necessary to enroll students." (*Id.*)  To achieve enrollment goals, enrollment advisors purportedly used "uniform scripted oral misrepresentations[.]" (*Id.* ¶ 9.)  However, the declaration only provides generalized contents of the purported "uniform scripts," such as "describ[ing] Bridgepoint schools as great school with amazing professors who offer individualized attention to students" and "claiming that a degree from Bridgepoint schools would provide students and prospective students a competitive advantage over graduates from other postsecondary schools." (*See id.*)

//

### C.   Student Complaints

Plaintiff is "one of the tens of thousands of students who [allegedly] fell victim to Bridgepoint's systematic false advertisements, material omissions, dissemination of misstatements, and boiler-room pressure recruiting tactics." (SAC ¶ 30.) Her initial contact with Bridgepoint started through the Internet, and in the time period leading up to enrollment at Ashford in 2006, "a Bridgepoint enrollment advisor used high-pressure sales tactics on her by calling her several times a week." (*Id.*) According to Plaintiff, the enrollment advisor made numerous misrepresentations, including:

- "Bridgepoint schools offered the most affordable education to students, and the tuition and costs were the 'lowest' and could not be found elsewhere";

- "Federal financial aid would cover all tuition, books, fees, and other costs, including costs for purchasing computers and software";

- "The need to enroll as soon as possible and to apply for maximum financial aid was urgent";

- "Bridgepoint schools are fully accredited, and all credits awarded by Bridgepoint schools are transferable to other higher education institutions"; and

- "A high percentage of Bridgepoint graduates found jobs in their fields of studies immediately following graduation, and earned tens of thousands of dollars in annual income."

(*Id.*) Plaintiff alleges that all of these statements are lies. (SAC ¶ 31.) And though inaccurate, "these statements are part of the uniform script designed by Bridgepoint, and used by all Bridgepoint enrollment advisors during their communications with prospective students." (*Id.*)

//

//

//

11cv69

Other students had similar experiences.  For example, one student, a veteran, was repeatedly told by recruiters that his post-9/11 GI Bill benefits would cover the entire cost of his degree, only to find out after he was enrolled that he would owe approximately $11,000 to Ashford that his benefits did not cover.  (Bottini Decl. Ex. 3.[3]) According to that student, he "was extremely disappointed, confused and angry[,]" and felt that he "ha[d] been misled, deceived or even outright lied to in an effort to gain [his] contractual agreement."  (Bottini Decl. Ex. 3, Document 1.)  That said, the student did note that except for incident involving tuition, he "thoroughly enjoyed [his] affiliation with Ashford University and [has] effectively referred several people to this University" because he "completely believe[s] in the concepts that Ashford subscribes to and [has] been a strong advocate of this University."  (*Id.*)

In another example, a student was told that he would be able to receive his teaching license from Ashford.  (Bottini Decl. Ex. 3, Document 2.)  But a year later, right before his scheduled graduation, he found out that Ashford was not allowed by the state of Iowa to award teaching licenses, so he would have to attend a "cooperating school" in Arizona for a year.  (*Id.*)  The student "was really blown away to find out that [he] had spent so much time and money at a College that [he] was not going to be able to obtain [his] Teacher's license from."  (*Id.*)

Another student entered Ashford intending to become a licensed dental assistant.  (Bottini Decl. Ex. 3, Document 3.)  Recruiters told him that he could achieve this goal at Ashford.  (*Id.*)  After becoming suspicious about the lack of dental classes one year in, he raised his suspicion with his academic advisor who told him Ashford would not lead to a dental assistant license and that "she didn't really have anything to say."  (*Id.*)  The student told the school that he felt that he was "completely and utterly lied to,"

---

[3] Exhibit 3 to the Bottini Declaration includes a summary of the U.S. Senate Committee on Health, Education, Labor, and Pensions ("Senate HELP Committee")'s of many of the student complaints it received as a part of its investigation in addition to copies of over 20 different actual student complaints.  This document is a part of a collection of documents produced by the Senate HELP Committee's investigation "focusing on the Federal investment in for-profit higher education companies and whether the $26 billion in annual taxpayer money flowing to this sector is a good value for students and taxpayers."  (Bottini Decl. Ex. 1; *see also* Bottini Decl. Exs. 2, 3, 5.)

only to be left with $9,000 in loans and $3,000 owed to the school.  (*Id.*)

In addition to experiences where students felt lied to by recruiters, student complaints included a broad range grievances: (1) students who could not get a response to their requests for help once enrolled; (2) students who found out after leaving or graduating that they owed money; (3) mishandling of student financial aid; (4) students who were not informed of a technology fee; (5) lack of accommodation for students who need extra help; (6) problems with transfer credits; (7) students who felt worse off after attending Ashford; and (8) complaints directed at specific teaching programs, such as the use of an outdated curriculum.  (Bottini Decl. Ex. 3.)  Plaintiff supports her motion with student complaints that touch upon each and every one of the general categories listed above.[4]

### D.    Procedural History[5]

There are two related actions filed in this district: (1) *Rosendahl v. Bridgepoint Education, Inc.*, No. 11-cv-61-BAS(WVG) (S.D. Cal. Jan 11, 2011); and (2) *Ferguson v. Bridgepoint Education, Inc.*, No. 11-cv-493-BTM(DHB) (S.D. Cal. Mar. 10, 2011).[6] Both actions name the same defendants—Bridgepoint, Ashford, and The Rockies—and the same plaintiffs' counsel—Francis A. Bottini—as this action.

*Rosendahl* was strikingly similar to this action, alleging similar facts and asserting nearly identical claims, including claims for violations of the California Business & Professions Code §§ 17200 and 17500, violation of the California Consumer Legal Remedies Act ("CLRA"), and negligent misrepresentation.   The

---

[4] Defendants contend that the Senate HELP Committee's documents are inadmissible and irrelevant.  (Defs.' Opp'n 24:11–25:22.)  Despite this objection, the Court will nonetheless consider the Senate HELP Committee documents.

[5] On May 15, 2014, this action was transferred to this Court.  Prior to that date, the Honorable William Q. Hayes presided over this action.  All orders issued prior to May 15, 2014 were issued by Judge Hayes.

[6] One of the named plaintiffs in *Ferguson* is Ryan Ferguson, whose declaration is included in support of Plaintiff's class-certification motion.

plaintiffs in *Rosendahl* also proposed a near-verbatim class definition as the one proposed in this action, down to the proposed class period, with the only difference being the inclusion of University of the Rockies[7]:

> All persons in the United States, who during the period from approximately March 1, 2005 through the present . . ., enrolled in and/or attended classes offered by Bridgepoint Education through either of its two academic institutions, Ashford University or University of the Rockies. Excluded from the Class are defendants, their immediate families, subsidiaries, affiliates, successors-in-interest, representatives, trustees, executors, administrators, heirs, assigns or transferees, any person acting on behalf of defendants, all governmental entities, and co-conspirators.

Ultimately, on February 28, 2012, the *Rosendahl* action was administratively closed after the court granted the defendants' motion to compel arbitration.

*Ferguson* was a *qui tam* action brought under the False Claims Act, based on allegations that prospective students were induced to enroll at Bridgepoint schools by making misrepresentations and concealing material information. The United States chose to decline to intervene, and on June 13, 2013, the case was eventually dismissed without prejudice at the joint request of the parties.

This action commenced on January 12, 2011, around the same time as *Rosendahl* and *Ferguson*. Plaintiff amended the complaint twice, the current operative complaint being the SAC. Plaintiff asserts five claims under California law in her SAC: (1) Violation of Business & Professions Code § 17200 (Unfair Trade Practices Act, also known as Unfair Competition Law or "UCL"); (2) Violation of Business & Professions Code § 17500 (False Advertising Act or "FAL"); (3) Violation of the CLRA; (4) Violation of Civil Code § 1710(3); and (5) Negligent Misrepresentation.

Now pending before the Court are Defendants' motion for sanctions and Plaintiff's motion for class certification. Both motions are opposed. The Court will address both motions below in turn, beginning with Defendants' motion for sanctions,

---

[7] The proposed class definition from *Rosendahl* can be found in paragraph 34 of that action's complaint.

which presents a preliminary issue that needs to be resolved before reaching Plaintiff's motion for class certification.

## II.   DEFENDANTS' MOTION FOR SANCTIONS[8]

On May 9, 2013, Plaintiff served Defendants initial disclosures pursuant to Federal Rule of Civil Procedure 26(a)(1). (Bottini Decl ¶ 10; Young Decl. ¶ 2; Pl.'s Initial Disclosures 2:19–23.) Subsequently, on June 7, 2013, Plaintiff served Defendants her First Amended Initial Disclosures. (Bottini Decl. ¶ 10; Pl.'s First Am. Initial Disclosures 185:1–186:19.) In both disclosures, Plaintiff did not list Ryan Ferguson as a potential witness in this litigation. (Bottini Decl. ¶ 10; Young Decl. ¶ 2; Pl.'s Initial Disclosures 2:24–3:9; Pl.'s First Am. Initial Disclosures 185:1–186:19.)

As previously mentioned, Mr. Ferguson is a former employee of Defendants who had filed a *qui tam* action against them in March 2011. *See Ferguson*, No. 11-cv-493. Plaintiff's current counsel, Mr. Bottini, along with two other attorneys represented Mr. Ferguson and his co-plaintiff in the *qui tam* action. Similar to Plaintiff's SAC and Mr. Ferguson's declaration in support of Plaintiff's class-certification motion, Mr. Ferguson alleged Defendants incentivized their employees to use uniform written and scripted oral misrepresentations in an effort to meet enrollment quotas. The matter was dismissed on June 13, 2013. (*See* Bottini Decl. ¶ 3.)

On August 6, 2013, Defendants served Plaintiff with interrogatories. (Young Decl. ¶ 3; Defs.' Interrog. 7:15–12:25.) The interrogatories sought facts, documents, and witnesses supporting specific allegations in Plaintiff's SAC. (*See* Defs.' Interrog. 7:15–12:25.) Defendants' sixteenth interrogatory, particularly relevant here, requested

---

[8] All references to documents and exhibits—in particular, the declarations of counsel—in this section are to the attachments to the parties' briefing addressing Defendants' motion for sanctions. It is important to note this footnote to avoid confusion with documents and exhibits related to the class-certification motion. Furthermore, in abbreviating citations to the briefs of the two pending motions, "Mot.," "Opp'n," and "Reply" refer to the class-certification briefs, and "Sanctions Mot.," "Sanctions Opp'n," and "Sanctions Reply" refer to the sanctions briefs.

Plaintiff to "[s]tate all facts that support [her] allegation in paragraph 52 of the SAC that [Defendants] 'make uniform written and scripted oral misrepresentations' . . . including but not limited to . . . any [persons] who provided these statements." (Defs.' Interrog. 10:17–23.)   Plaintiff served responses to Defendants' interrogatories on October 9, 2013.  (Bottini Decl. ¶ 12; Pl.'s Resp. Defs.' Interrog. 27:1–28:22.)  But she again failed to identify Mr. Ferguson, or any other witness, as requested by Defendants' sixteenth interrogatory.   Plaintiff merely objected to the interrogatory while also directing Defendants' attention to the allegations set forth in her SAC.  (Young Decl. ¶ 4; Pl.'s Resp. Defs.' Interrog. 27:1–28:22.)

On November 22, 2013, the parties' counsel met and conferred regarding Plaintiff's responses to Defendants' interrogatories.  (Young Decl. ¶ 5.)  Plaintiff's counsel "confirmed that Plaintiff possessed no additional information responsive to Defendants' interrogatories," "was not withholding any responsive information as privileged or protected[,]" and "did not intend to further supplement her interrogatory responses and would not use any previously undisclosed witnesses to support her claims." (Young Decl. ¶ 6.)  On January 9, 2014, Defendants' counsel sent a letter to Plaintiff's counsel confirming these representations and stating they would "move to exclude any . . . witnesses that [P]laintiff ha[d] not disclosed in her responses . . . should [P]laintiff attempt to later provide, produce or disclose such . . . witnesses in support of the various specific contentions[.]" (Defs.' Sanctions Mot. Ex. 4.)

On March 31, 2014, the period allotted for class-certification-related discovery closed.[9]   (Case Mgmt. Conference Order 2:17–19.)  And then, on April 30, 2014, Plaintiff filed her now-pending motion for class certification.  She also submitted a declaration from Mr. Ferguson in support of the class-certification motion. (ECF No. 78-19.)  Plaintiff's motion for class certification relies heavily on Mr. Ferguson's

_____

[9] Discovery in this litigation was bifurcated; the first phase limited to solely discovery of class-certification-related evidence occurred from September 23, 2013 until March 31, 2014.  (*See* ECF No. 61.)

declaration to substantiate her contention that her proposed class satisfies Rule 23(a)'s commonality requirements.  (*See* Pl.'s Mot. 27:7–28.)

One week after filing her class-certification motion, Plaintiff served Defendants her Second Amended Initial Disclosures.  (Young Decl. ¶ 8; Pl.'s Second Am. Initial Disclosures 2:21–26.)  In these disclosures, Plaintiff listed Mr. Ferguson as a possible witness "likely to have discoverable information" regarding "Defendants' policies and practices . . . relating to recruiting prospective students . . . and keeping students in enrollment."  (Pl.'s Second Am. Initial Disclosures 3:23–4:1.)

On June 9, 2014, Defendants filed a motion for Rule 37 sanctions concerning Plaintiff's failure to disclose Mr. Ferguson as witness in her initial discovery disclosures and failure to amend her initial disclosures in response to Defendants' interrogatories.  Plaintiff opposes Defendants' sanctions motion.

## A.    Rule 26's Disclosure Requirement

Federal Rule of Civil Procedure 26(a) states "a party must, without awaiting a discovery request, provide to the other parties . . . the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment[.]" Fed. R. Civ. P. 26(a)(1)(A)(i).  Additionally, Rule 26(e) requires "[a] party who has made a disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production, or request for admission—[to] supplement or correct its disclosure or response . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing[.]"  Fed. R. Civ. P. 26(e)(1)(A).

//

//

Where "a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). "In addition to or instead of this sanction, the court on motion and after being given an opportunity to be heard" may instead "order payment of the reasonable expenses, including attorney's fees, caused by the failure[,] may inform the jury of the party's failure[,] or may impose other appropriate sanctions[.]" Fed. R. Civ. P 37(c)(1)(A)–(C). The Ninth Circuit "give[s] particularly wide latitude to the district court's discretion to issue sanctions under Rule 37(c)(1)." *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001). This is because "[p]arties, aware of the 'self-executing' and 'automatic' nature of Rule 37(c)(1) sanctions, have a right to expect that only disclosed witnesses will be used to support the disclosing party's claims and defenses." *Rhodes v. Sutter Health*, 949 F. Supp. 2d 997, 1010 (E.D. Cal. 2013) (quoting *Yeti*, 259 F.3d at 1106); *see also* Fed. R. Civ. P. 37 advisory committee's note (1993) ("This automatic sanction provides a strong inducement for disclosure of material that the disclosing party would expect to use as evidence.").

## B. Violation of Rule 26's Disclosure Requirement

Defendants argue Plaintiff violated Rule 26(a) by failing to disclose Mr. Ferguson in her initial disclosures and in her responses to Defendants' interrogatories. (Defs.' Sanctions Mot. 8:5–8.) Conversely, Plaintiff contends she has not violated Rule 26's disclosure requirements because she "did not intend to use Ferguson as a witness until late April 2014," past the point at which she had filed her SAC and served Defendants responses to their interrogatories, and because Mr. Ferguson is not the source of the allegations contained in her SAC. (Pl.'s Sanctions Opp'n 14:11–18.) As a result, Plaintiff argues she was not required to disclose Mr. Ferguson as a witness in her initial disclosures or subsequent interrogatory responses to Defendants. (*Id.* at

13:15–16.)

The suspicious circumstances surrounding Mr. Ferguson strongly suggest Plaintiff violated Rule 26's disclosure requirements.  Plaintiff's counsel—Mr. Bottini—previously represented Mr. Ferguson in an action against Defendants which featured allegations closely matching those Plaintiff asserts in her SAC.  As such, Plaintiff cannot claim she was unaware of Mr. Ferguson's identity prior to responding to Defendants' interrogatories or serving her Second Amended Initial Disclosures.  It is irrelevant whether Plaintiff herself, rather than her counsel, knew Mr. Ferguson had discoverable information that could substantiate her allegations in the SAC at the time she served Defendants her responses to their interrogatories because "[a] party cannot refuse to answer interrogatories on the ground that the information sought is solely within the knowledge of his attorney."  *See Hickman v. Taylor*, 329 U.S. 495, 504 (1947).  Hence, given Plaintiff's counsel's knowledge of Mr. Ferguson's previous litigation against Defendants and the similarity of Mr. Ferguson's complaint to Plaintiff's SAC, Mr. Ferguson was an "individual likely to have discoverable information" that Plaintiff might have "used to support [her] claims." *See* Fed. R. Civ. P. 26(a)(1)(A)(i).

Additionally, Plaintiff's reliance on the 2006 Advisory Committee's notes' reference to "intent" to demonstrate that she complied with Rule 26's requirements is misplaced.  (*See* Pl.'s Sanctions Opp'n 12: 7–13, 16:9–12.)   Requiring parties to disclose only those witnesses they subjectively intend to use in substantiating their claims, rather than those they merely "may use" as Rule 26 explicitly requires, would erode the efficacy of the rule's disclosure requirements.  *See* Fed. R. Civ. P. 26(a). Parties would be free to engage in the sort of "gamesmanship" Rule 26 intends to prevent by hiding witnesses and evidence that they have to offer from their opposition. *See* Fed. R. Civ. P. 26 advisory committee's note (1993).  Such is not the spirit of Rule 26.  *See Thomas v. Old Town Dental Grp., P.A.*, 300 F.R.D. 585, 589 (S.D. Fla. 2014) (noting that a party's contention it need not disclose fact witnesses in response to an

interrogatory calling for fact witnesses unless the party "chose to rely" on the witnesses was meritless because such an intent-based disclosure requirement "would permit litigants to easily hide unfavorable witnesses with impunity"). Consequently, Plaintiff was required to disclose Mr. Ferguson regardless of whether she subjectively intended to use him as a witness prior to late April 2014.

Furthermore, Plaintiff's argument concerning her lack of intent to use Mr. Ferguson as a witness prior to serving Defendants her Second Amended Initial Disclosures is dubious. Thus far, Mr. Ferguson's declaration is the primary evidence Plaintiff offers to substantiate her claims that Defendants use "uniform scripted oral misrepresentations" in conducting their business. (Pl.'s Mot. 16:3 (quoting Ferguson Decl. ¶ 9); *see also* SAC ¶¶ 52, 55.) Under Federal Rule of Civil Procedure 11, in presenting a pleading to a federal court, an attorney "certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery[.]" Fed. R. Civ. P. 11. Therefore, assuming Plaintiff was complying with Rule 11 when filing her SAC, and keeping in mind both the fact that Mr. Ferguson is one of the few, if not the only, witness Plaintiff offers in support of the allegations highlighted above and Plaintiff's counsel's knowledge of Mr. Ferguson's previous complaint against Defendants, it is highly unlikely Plaintiff would not have intended to use Mr. Ferguson to support her claims at the times she filed her SAC or later when served her responses to Defendants' interrogatories.

Accordingly, Plaintiff's failure to identify Mr. Ferguson in her initial disclosures and in response to Defendants' interrogatories violated Rule 26's disclosure requirements.

//

//

//

### C.   Substantial Justification or Harmlessness

Defendants contend Plaintiff's non-disclosure was neither substantially justified nor harmless because the sudden introduction of Mr. Ferguson's declaration surprised Defendants in a manner that cannot be cured, brought in evidence quintessential to Plaintiff's SAC and motion for class certification, and cannot be founded on any reasonable explanation by Plaintiff. (*See* Defs.' Sanctions Mot. 8:1–18.)  In response, Plaintiff argues she was substantially justified in not disclosing Mr. Ferguson's identity because "it cannot be disputed that [she] ha[d] no obligation to identify Ferguson as a witness." (*See* Pl.'s Sanctions Opp'n 21:6–7 (emphasis in original).)  Additionally, Plaintiff avers her non-disclosure was harmless because Defendants have known of "[Mr. Ferguson's] allegations of their illegal practices since December 2012" and did not delineate "what possible remedial measures are appropriate" or how they were harmed by Plaintiff's non-disclosure. (*Id.* at 21:6–7, 21:14–15, 21:22–23, 22:24.)

Rule 37's exclusionary sanction may be avoided and "information may be introduced if the [non-disclosing] parties' failure to disclose the required information [wa]s substantially justified or harmless." *Yeti*, 259 F.3d at 1106 (quoting Fed. R. Civ. P. 37(c)(1)).  "The party facing sanctions bears the burden of proving that its failure to disclose the required information was substantially justified or is harmless." *R & R Sails, Inc. v. Ins. Co. of Penn.*, 673 F.3d 1240, 1246 (9th Cir. 2012).

Plaintiff fails to meet her burden of demonstrating that her failure to disclose Mr. Ferguson was either substantially justified or harmless.  As the Court explained above, Plaintiff is wrong in contending that she had no obligation whatsoever to disclose Mr. Ferguson's identity to Defendants.  Therefore, she was not substantially justified for her non-disclosure on the basis of having had no obligation to do so.

Additionally, Plaintiff's citation to *Krzesniak v. Cendant Corp.*, No. C 05-05156 MEJ, 2007 WL 1795703, *1 (N.D. Cal. June 20, 2007), in supporting her argument that her non-disclosure was substantially justified is misplaced. (*See* Pl.'s Sanctions Opp'n 21:10–12.)  There, the plaintiff was substantially justified in failing to initially disclose

a witness it later relied on where the plaintiff was unable to locate the witness because the defendant—who was the employer of the witness—had opposed the plaintiff's previous request for the witness' contact information. *See Krzesniak*, 2007 WL 1795703, at *5.

Here, Defendants in no way hid Mr. Ferguson's identity from Plaintiff at any point during this litigation. Indeed, it is quite apparent it is Plaintiff who hid Mr. Ferguson's identity from Defendants until the deadline for class-certification discovery passed. Therefore, Plaintiff fails to meet her burden of demonstrating that she was substantially justified in failing to disclose Mr. Ferguson's identity to Defendants pursuant to Rule 26 on this ground as well.

Similarly, Plaintiff fails to demonstrate her failure to disclose Mr. Ferguson's identity was harmless. Contrary to Plaintiff's contentions, any failure on the part of Defendants to delineate how Plaintiff's non-disclosure was harmful does not carry her burden of demonstrating her non-disclosure was harmless. *See R & R Sails*, 673 F.3d at 1246 ("The party facing sanctions bears the burden of proving that its failure to disclose the required information was substantially justified or is harmless."). Plaintiff's only argument supporting her non-disclosure was harmless is that Defendants had knowledge of Mr. Ferguson's prior complaint against them, meaning they could not have been surprised by his introduction. (*See* Pl.'s Sanctions Opp'n 21:6–7, 21:14–15, 21:22–23, 22:24.) However, this argument is without merit.

It is where a witness has been alluded to in the same litigation, not different litigation, that a party's failure to disclose a witness has been considered harmless. *See Van Maanen v. Youth With a Mission-Bishop*, 852 F. Supp. 2d 1232, 1237 (E.D. Cal. 2012), *aff'd sub nom. Van Maanen v. Univ. of the Nations, Inc.*, 542 F. App'x 581 (9th Cir. 2013) (finding a failure to disclose a witness harmless where the identity, location and subject of information possessed by a witness was revealed during numerous depositions in the same case months before the discovery cut-off date). Here, however, there is no indication Mr. Ferguson was alluded to in any depositions taken or any

other proceedings in this litigation.   Rather, after responding to Defendants' interrogatories, Plaintiff's counsel assured Defendants they were not withholding any witnesses not already disclosed.  (Young Decl. ¶ 6.)

Courts have even found the non-disclosure of a witness harmful where the witness was referenced in the same litigation.  *See Rhodes*, 949 F. Supp. 2d at 1010 (finding a plaintiff's non-disclosure of a witness was not harmless where, although the witness had been referenced in depositions, the defendant "was not on sufficient notice that [the witness] possessed information that supported plaintiff's claims or defenses such that [the defendant] could make an informed decision about whether to pursue discovery as to [the witness]").  Like the defendant in *Rhodes*, Defendants here lacked any notice Plaintiff would be using Mr. Ferguson as a witness in light of Plaintiff's failure to initially disclose his identity, subsequent failure to disclose his identity in response to Defendants' interrogatories, and further confirmation they were not withholding any additional witnesses.  Following that chain of events, Plaintiff cannot now claim Defendants' knowledge of Mr. Ferguson's prior litigation against them rendered her failure to disclose Mr. Ferguson's identity prior to her Second Amended Initial Disclosures harmless.

Because Plaintiff violated Rule 26 and fails to demonstrate that this violation was substantially justified or harmless, Defendants are entitled to sanctions under Rule 37.

### D.    Appropriate Sanction

Defendants argue the exclusion of Mr. Ferguson's declaration is the only appropriate sanction because lesser remedies would be insufficient to correct the prejudice Plaintiff's non-disclosure cost them and because further discovery and litigation of the class certification would entail substantial cost.  (*See* Defs.' Sanctions Mot. 10:11–11:6.)  In response, Plaintiff contends no sanctions are appropriate here because she "has complied with her disclosure obligations" and Defendants have

consequently "suffered no harm[.]" (Pl.'s Sanctions Opp'n 8:2–3, 8:16.)  Plaintiff asserts that, at most, Defendants should be allowed to depose Mr. Ferguson. (*See id.* at 8:18–20.)

Because Defendants' motion for sanctions may materially affect the course of litigation, the Court must consider sanctions aside from the complete exclusion of Mr. Ferguson's declaration. By excluding Mr. Ferguson's declaration, Defendants' motion here may undermine the merits of Plaintiff's motion for class certification.[10]  Thus, in adjudicating Defendants' motion for Rule 37 sanctions, the Court is "required to consider whether the claimed noncompliance involved willfulness, fault, or bad faith . . . and also consider the availability of lesser sanctions." *R & R Sails*, 673 F.3d at 1247 (internal citation omitted).

Here, Plaintiff is incorrect in her contention that no sanctions, or alternatively, allowing Defendants to depose Mr. Ferguson, would be proper.  Rather, exclusion of and striking any references to Mr. Ferguson's declaration in Plaintiff's motion for class certification and SAC is proper.  Plaintiff is correct in noting the Court could re-open class-certification discovery and allow Defendants to depose Mr. Ferguson rather than exclude Mr. Ferguson's declaration and impose monetary sanctions against Plaintiff. (*See* Pl.'s Sanctions Opp'n 24:17–18.)  However, despite this possibility, Rule 37's default remedy of exclusion is appropriate under these circumstances. *See* Fed. R. Civ. P. 37 advisory committee's note (1993) (noting Rule 37 "provides a self-executing sanction" which "prevents a party from using as evidence any witness or information that . . . has not been disclosed as required by Rules 26(a) and 26(e)(1)").

As discussed above, Plaintiff's violation of Rule 26 is without substantial

---

[10] Plaintiff's motion for class certification relies heavily on Mr. Ferguson's declaration to substantiate the contention that her proposed class satisfies Rule 23(a)'s commonality requirement. (*See* Pl.'s Mot. 27:7–28.); *see also* 28 U.S.C. § 636(b)(1)(A) (noting district court judges may not designate magistrate judges to hear and determine motions to "dismiss or permit maintenance of a class action"); *Maisonville v. F2 America, Inc.*, 902 F.2d 746, 747 (9th Cir.1989) (agreeing with other appellate courts that it is motions for discovery sanctions under Rule 37 not contained within 28 U.S.C. § 636(b)(1)'s list that are non-dispositive matters).

justification or harmlessness.  Plaintiff was well aware of Mr. Ferguson as an individual likely to have discoverable information supporting her claims, and she had a duty to disclose Mr. Ferguson's identity to Defendants under Rule 26.  Simply re-opening class-certification discovery and allowing Defendants to depose Mr. Ferguson would strip Rule 26 and Rule 37 of their efficacy.  Rule 37's exclusionary sanction exists with the purpose of deterring litigants from "hiding the ball" as Plaintiff has done here.  *See Rhodes*, 949 F. Supp. 2d at 1010 (quoting *Yeti*, 259 F.3d at 1106) ("Parties, aware of the 'self-executing' and 'automatic' nature of Rule 37(c)(1) sanctions, have a right to expect that only disclosed witnesses will be used to support the disclosing party's claims and defenses.").

Plaintiff's failure to disclose Mr. Ferguson's identity before the close of discovery for class certification prejudiced Defendants by, at the very least, preventing them from deposing him as a witness during the regular course of litigation.  Had Plaintiff properly disclosed Mr. Ferguson's identity as a witness prior to serving Defendants her Second Amended Initial Disclosures, Defendants could have deposed Mr. Ferguson as a witness during discovery and fully litigated against Plaintiff's motion for class certification.  It would be unreasonable to burden Defendants with the costs of deposing Mr. Ferguson and amending their opposition to Plaintiff's motion for class certification at this time.  Plaintiff directly induced Defendants into believing they had no further need to undertake discovery relating to class certification in this litigation.

Therefore, because Plaintiff's non-disclosure violates Rule 26 and is not substantially justified or harmless, exclusion of Mr. Ferguson's declaration is appropriate.  *See Ollier v. Sweetwater Union High Sch. Dist.*, 267 F.R.D. 339, 343–44 (S.D. Cal. 2010) (Lorenz, J.) (excluding fact witnesses where, although the witnesses had been at least mentioned during various depositions, discovery had closed and non-disclosure was harmful and without substantial justification).  *Cf. R & R Sails*, 673 F.3d at 1246 (holding a district court's exclusion of evidence pursuant to Rule 37 was

improper because the court failed to consider whether the non-disclosure involved willfulness, fault, or bad faith, or if lesser sanctions were a viable option).

## III.   PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

The class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2550 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)).  In order to justify a departure from that rule, "a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Id.* (citing *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)).  In this regard, Rule 23 contains two sets of class-certification requirements set forth in Rule 23(a) and (b). *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union v. ConocoPhillips Co.*, 593 F.3d 802, 806 (9th Cir. 2010).  "A court may certify a class if a plaintiff demonstrates that all of the prerequisites of Rule 23(a) have been met, and that at least one of the requirements of Rule 23(b) have been met." *Otsuka v. Polo Ralph Lauren Corp.*, 251 F.R.D. 439, 443 (N.D. Cal. 2008).

"Rule 23(a) provides four prerequisites that must be satisfied for class certification: (1) the class must be so numerous that joinder of all members is impracticable; (2) questions of law or fact exist that are common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." *Otsuka*, 251 F.R.D. at 443 (citing Fed. R. Civ. P. 23(a)).  "A plaintiff must also establish that one or more of the grounds for maintaining the suit are met under Rule 23(b), including: (1) that there is a risk of substantial prejudice from separate actions; (2) that declaratory or injunctive relief benefitting the class as a whole would be appropriate; or (3) that common questions of law or fact predominate and the class action is superior to other available methods of adjudication." *Id.* (citing Fed. R.

Civ. P. 23(b)).

Plaintiff proposes the following class definition:

> All person in the United States who enrolled in and/or attended classes offered by Bridgepoint Education, Inc. through Ashford University during the period from approximately March 1, 2005 through the present ("Class Period"). Excluded from the class are defendants, defendants' immediate families, subsidiaries, affiliates, successors-in-interest, representatives, trustees, executors, administrators, heirs, assigns or transferees, any person acting on behalf of defendants, all governmental entities, and coconspirators.

She contends that the class is ascertainable and satisfies all the requirements of Rule 23(a), and seeks class certification under Rule 23(b)(3). Defendants, in response, argue: (1) students enrolled on or after May 18, 2007 should be excluded from the class because they are subject to an arbitration provision; (2) certification of a nationwide class under California law is improper; (3) the proposed class lacks commonality; and (4) class treatment is not proper because individual issues will predominate in determining liability.

Rule 23(b)(3) requires the court to find "that the questions of law or fact common to class members predominate over any questions affecting only individual members." "The predominance inquiry focuses on 'the relationship between the common and individual issues' and 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 944 (9th Cir. 2009). "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling a dispute on a representative rather than on an individual basis." *In re Infineon Tech. AG Sec. Litig.*, 266 F.R.D. 386, 395 (N.D. Cal. 2009). In contrast, when "claims require a fact-intensive, individual analysis," then class certification will "burden the court" and be inappropriate. *Vinole*, 571 F.3d at 947; *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001) ("[I]f the main issues in a case require the separate adjudication of each class member's individual claim or defense, a Rule 23(b)(3) action

1   would be inappropriate[.]").

> Rule 23(b)(3)'s predominance and superiority requirements were added to cover cases in which a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results. Accordingly, a central concern of the Rule 23(b)(3) predominance test is whether adjudication of common issues will help achieve judicial economy.

*Vinole*, 571 F.3d at 944 (internal quotation marks and citations omitted).

Though there is substantial overlap between Rule 23(a)(2)'s commonality and Rule 23(b)'s predominance tests, the latter is a "far more demanding" standard. *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1172 (9th Cir. 2010) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997)). To determine whether questions of law or fact common to the class predominate, the court must analyze each claim separately. *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1068 (9th Cir. 2014) (citing *Erica P. John Fund, Inc. v. Halliburton Co.*, — U.S. —, 131 S. Ct. 2179, 2184 (2011)).

"Plaintiffs must also demonstrate that a class action is 'superior to other available methods for fairly and efficiently adjudicating the controversy.'" *Otsuka*, 251 F.R.D. at 448 (citing Fed. R. Civ. P. 23(b)(3)). "Where classwide litigation of common issues will reduce litigation costs and promote greater efficiency, a class action may be superior to other methods of litigation," and it is superior "if no realistic alternative exists." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234-35 (9th Cir. 1996). The following factors are pertinent to this analysis:

> (A) the class members' interest in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

//

### A.   Ascertainability

"As a threshold matter, and apart from the explicit requirements of Rule 23(a), the party seeking class certification must demonstrate that an identifiable and ascertainable class exists." *Mazur v. eBay, Inc.*, 257 F.R.D. 563, 567 (N.D. Cal. 2009). Certification is improper if there is "no definable class." *See Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 730 (9th Cir. 2007).

"A class should be precise, objective, and presently ascertainable," though "the class need not be so ascertainable that every potential member can be identified at the commencement of the action." *O'Connor v. Boeing N. Am. Inc.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998) (internal quotation marks omitted). "A class is ascertainable if it is defined by 'objective criteria' and if it is 'administratively feasible' to determine whether a particular individual is a member of the class." *Bruton v. Gerber Prods. Co.*, No. 12-CV-02412-LHK, 2014 WL 2860995, at *4 (N.D. Cal. June 23, 2014). However, "[a] class definition is inadequate if a court must make a determination of the merits of the individual claims to determine whether a person is a member of the class." *Hanni v. Am. Airlines, Inc.*, No. C 08-00732, 2010 WL 289297, at *9 (N.D. Cal. Jan. 15, 2010). "It is not fatal for a class definition to require some inquiry into individual records, as long as the inquiry is not so daunting as to make the class definition insufficient." *Herrera v. LCS Fin. Servs. Corp.*, 274 F.R.D. 666, 673 (N.D. Cal. 2011) (internal quotation marks omitted).

The ascertainability issue presented to the Court is what effect arbitration provisions included in student enrollment agreements beginning on May 18, 2007 have on class treatment. Defendants argue that the fact that the Court has found that the enrollment agreements are enforceable in *Rosendahl* coupled with evidence that over 96% of the proposed class would be subject to the arbitration provision should end the class-certification inquiry. (Defs.' Opp'n 12:27–14:16.)   Plaintiff dismisses Defendants' argument contending Defendants are re-arguing already-rejected arguments and that they fail to meet their burden to demonstrate any valid arbitration

agreements with potential absent class members.  (Pl.'s Reply 1:19–4:5.)

On August 23, 2013, relying on *Herrera*, the Court concluded that "[a]lthough discovery may reveal that some unnamed class members in this case signed an enforceable arbitration agreement, [it] does not find that this fact demonstrates an overbroad or unascertainable class that forecloses certification *at this stage of the proceedings*." (Aug. 23, 2013 Order 6:9–27 (emphasis added).)  Though the Court was presented with substantially similar arguments and evidence, the Court did not exclude the possibility of revisiting the issue following discovery.  Upon reviewing the arguments presented and the circumstances of this case, revisiting the effect of the arbitration provisions at this juncture of litigation is appropriate.

In *Herrera*, the district court stated:

> The fact that *some* members of a putative class may have signed arbitration agreements or released claims against a defendant does not bar class certification.  Other courts presented with this issue have held that "class certification should not be denied merely because some class members may be subject to the defense that their claims are barred by valid documents releasing the defendant from liability."

*Herrera*, 274 F.R.D. at 681 (quoting *Coleman v. GMAC*, 220 F.R.D. 64, 91 (N.D. Tenn. 2004)) (emphasis added).  It is worth noting that the district court did not identify, of the 4,746 potential class members, how many may be subject to an arbitration provision. *See id.*  Thus, the extent of "some" is unclear. *See id.*  That said, the district court in *Pablo v. Servicemaster Global Holdings Inc.*, No. C 08-03894 SI, 2011 WL 3476473, at *3 (N.D. Cal. Aug. 9, 2011), directly addressed *Herrera*'s proposition and determined that class certification was not proper under the circumstances presented in its case because, "[a]lthough it is not clear how many putative class members signed arbitration agreements, the evidence . . . support[ed] an inference that a significant number did."  The *Pablo* Court noted that defendants had filed 37 motions to compel arbitration in eight related cases, all of which were granted. *Pablo*, 2011 WL 3476473, at *1.

//

The circumstances presented here are not as overwhelming or compelling as the circumstances described in *Pablo*. There has only been one related case—*Rosendahl*—in which a motion to compel arbitration was granted. However, Defendants present the Declaration of Kirk Morrison, Ashord's University Registrar and a Vice President (Morrison Decl. ¶ 1), who attaches eight exhibits of template enrollment agreements dating back from May 18, 2007 (Morrison Decl. ¶¶ 10–17; Morrison Decl. Exs. 1–8).

Before comparing the arbitration provisions in those eight templates, it is important to provide context and first consider the arbitration provisions in *Rosendahl* contained in enrollment agreements signed by the named plaintiffs in January 2009 and June 2009, which stated:

> Any disputes or controversies between the parties to this Agreement arising out of or relating to the student's recruitment, enrollment, attendance, education, billing, financial aid, financing options, student finance agreement, disbursement of funds, excess funds and other payments or career service assistance by Ashford . . . shall be resolved by binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association then in effect or in accordance with procedures that the parties agree to in the alternative.
>
> . . . . Any such arbitration shall be the sole remedy for the resolution of any disputes or controversies between the parties to this agreement.
>
> . . . . You and Ashford University may bring claims against the other only in your or its individual capacity, and not as a plaintiff or class member in any purported class or representative proceeding (including, but not limited to, class actions and class arbitrations).

Chen Decl. Exs. A & B, *Rosendahl*, No. 11-cv-61-BAS(WVG), ECF No. 25-2. The *Rosendahl* named plaintiffs appear to have signed enrollment agreements including the exact same arbitration provision. *Id.*

The eight template enrollment agreements attached to the Morrison Declaration all include arbitration provisions that also prohibit participation in class actions. In fact, the template used beginning in May 2007 appears to be identical to the arbitration provision in *Rosendahl*. (*See* Morrison Decl. ¶ 10, Ex. 1.) However, the remaining

seven templates used after July 2010 include a significant difference, an arbitration opt-out provision.  (Morrison Decl. Exs. 2–8.)

The following is opt-out language contained in six of the seven post-July 2010 enrollment-agreement templates: "You may reject the arbitration provisions included in this Section, but not the requirement to participate in the Grievance Procedure for Students prior to asserting a Claim against the University in any other manner, by faxing a signed rejection notice to the University Registrar . . . within fifteen (15) calendar days after you sign this Agreement." (*See* Morrison Decl. Exs. 3–8.)  The July 2010 template's language differs slightly from the later templates and allows up to 30 days to opt out, but is otherwise the same.  (*See id.* Ex. 2.)  Missing from all of the templates that include the opt-out language is the language stating, "Any such arbitration shall be the sole remedy for the resolution of any disputes or controversies between the parties to this agreement[,]" contained in the *Rosendahl* enrollment agreements and the July 2010 template.  (*See id.* Ex. 1.)

According to Defendants, "12,778 students enrolled [at Ashford] between March 1 and May 18, 2007, whereas 395,206 students have enrolled since May 18, 2007." (Morrison Decl. ¶ 3.)  And according to Plaintiff, Bridgepoint had 67,744 students enrolled as of June 2010, 42,025 students as of March 2009, and 19,509 students at the end of the first quarter of 2008.  (SAC ¶¶ 26–27.)  Though it is not definitive that the students as of June 2010 signed a pre- or post-May 2007 enrollment agreement, it is safe to surmise that they did not sign a post-July 2010 enrollment agreement with the opt-out language.  Assuming for the sake of argument that none of the students attending a Bridgepoint institution as of June 2010 signed a pre-May 2007 enrollment agreement, almost 68,000 students would be bound by arbitration provisions just as the named plaintiffs in *Rosendahl*.  The number of students enrolled from March 2005 to the commencement of this action totals almost 408,000 students based on the

enrollment numbers provided by Defendants.[11]  (*See* Morrison Decl. ¶ 3.)  Using these values, at least 16% of potential class members are probably bound by arbitration provisions, thereby precluding their participation in this or any other class action.  And this value could increase significantly depending on the proportion of students who did not actually opt out.

This uncertainty leads this Court to conclude that the proposed class as currently defined is neither precise nor presently ascertainable.  *See O'Connor*, 184 F.R.D. at 319.   Contrary to Plaintiff's position, there is evidence supporting Defendants' contention that post-May 2007 students signed enrollment agreements with arbitration provisions.  But it is not clear what proportion of the students opted out.  What is problematic is that for over 300,000 students who enrolled after May 2007, and more likely for students enrolled after July 2010, the Court is left with making a determination of the merits of the individual claims—namely, whether students are bound by the arbitration provision or whether they opted out—to determine whether students may participate as members of the class in this action.  *See Hanni*, 2010 WL 289297, at *9.

Accordingly, the Court finds that based on the proposed class definition as currently constructed, Plaintiff fails to demonstrate an identifiable and ascertainable class in light of evidence suggesting that up to 96% of the proposed class may not even be eligible to participate in this class action.[12]  *See Mazur*, 257 F.R.D. at 567.  This

---

[11] The 408,000 value is the result of adding the 12,778 value of students enrolled between March 2005 and May 2007 with the 395,206 value of students enrolled after May 2007.  (*See* Morrison Decl. ¶ 3.)

[12] Incorporating Federal Rule of Civil Procedure 8(c)(1)'s designation of statute of limitations and "arbitration and awards" as affirmative defenses, Plaintiff cites *Cameron v. E. M. Adams & Co.*, 547 F.2d 473, 477-78 (9th Cir. 1976) for the proposition that "the presence of 'individualized issues' based on a defense 'does not defeat the predominance of the common questions.'"  (Pl.'s Reply 3:6–16.)  However, *Cameron* does not make such a broad assertion.  Rather, it limits its holding regarding "the presence of individualized issues" to "compliance with statute of limitations." *Cameron*, 547 F.2d at 478-79.  Though Plaintiff's argument may have some merit, without additional legal authority stating otherwise, this Court construes the Ninth Circuit's holding in *Cameron* narrowly, limiting it to "individual issues of compliance with statute of limitations."

finding does not incorporate the foreseeable Rule 23(b)(3) problem involving predominance of common factual questions to determine which students opted out of the arbitration provisions.

## B.    Choice of Law

"A federal court sitting in diversity must look to the forum state's choice of law rules to determine the controlling substantive law." *Zinser*, 253 F.3d at 1187. "Under California's choice of law rules, the class action proponent bears the initial burden to show that California has 'significant contact or significant aggregation of contacts' to the claims of each class member." *Mazza v. Am. Honda Motor Co. Inc.*, 666 F.3d 581, 589 (9th Cir. 2012) (quoting *Wash. Mut. Bank, FA v. Superior Court*, 24 Cal. 4th 906, 921 (2001)). Once the class-action proponent makes this showing, the burden shifts to the other side to demonstrate "that foreign law, rather than California law, should apply to class claims." *Wash. Mut. Bank*, 24 Cal. 4th at 921.

California law may only be used on a classwide basis if "the interests of other states are not found to outweigh California's interest in having its law applied[.]" *Wash. Mut. Bank*, 24 Cal. 4th at 921. To determine whether the interests of other states outweigh California's interest, the court looks to a three-step governmental interest test:

> First, the court determines whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different.

> Second, if there is a difference, the court examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists.

> Third, if the court finds that there is a true conflict, it carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state and then ultimately applies the law of the state whose interest would be more impaired if its law were not applied.

*Mazza*, 666 F.3d at 590 (quoting *McCann v. Foster Wheeler LLC*, 48 Cal. 4th 68, 87-88 (2010)).

Defendants argue that Plaintiff fails to carry her initial burden, relying on the inadequate "mere fact" that Bridgepoint's headquarters is in California while also pointing out that Plaintiff had never been to California prior to the commencement of this lawsuit. (Defs.' Opp'n 15:10–15:16.) They alternatively argue that even if Plaintiff carried her burden, California law still cannot apply because the circumstances of this case fail *Mazza*'s three-step governmental-interest test. (*Id.* at 15:17–19:1.) Plaintiff responds by arguing Defendants fail to: (1) show that any differences in state laws are material in this case; and (2) meet their burden showing that the interests of other states outweigh California's interest. (Pl.'s Reply 4:8–5:20.)

### 1.    Conflict of Laws

"The fact that two or more states are involved does not in itself indicate there is a conflict of laws problem." *Wash. Mut. Bank*, 24 Cal. 4th at 919-20. "A problem only arises if differences in state law are material, that is, if they make a difference in this litigation." *Mazza*, 666 F.3d at 590.

Plaintiff contends that Defendants have "utterly failed" to show that the differences in state laws are material in this case. (Pl.'s Reply 4:8–21.) Specifically, citing *In re PM Wonderful LLC Marketing & Sales Practices Litigation*, No. ML 10-02199 DDP (RZx), 2012 WL 4490860, at *3-4 (C.D. Cal. Sept. 28, 2012) ("*POM I*"), Plaintiff dismisses references to the Declaration of Rachel Yourtz, which contains two charts summarizing research regarding the differences between state laws, because the research is "*not* evidence and does *not* show why these differences are *material in this case*." (*Id.* (emphasis in original).)

In *POM I*, the circumstances in which the district court rejected the defendant's reliance on a similar chart as those submitted in this case differ from the means in which the charts are used in this case. The *POM I* Court noted that a chart

summarizing each state's consumer-protection law's provisions regarding elements such as scienter, reliance, and timeliness, as well as remedies and defenses was provided, but the defendant failed to "indicate which of these foreign laws differ from California's laws." *POM I*, 2012 WL 4490860, at *3. This criticism of the defendant's failure is particularly evident when examining the defendant's brief opposing the plaintiff's class-certification motion. *See* Brief in Opp'n to Class Certification at 12:11–14:3, *POM I*, No. 10-ml-02199 (C.D. Cal. June 25, 2012), ECF No. 92. Nowhere in the defendant's briefing does it explain that any material differences exist between California's and other states' laws. *See id.* Rather, the chart in question is merely cited in a footnote with a parenthetical explanation stating that the "chart [was] prepared to assist the Court in identifying state law variations in consumer protection and deceptive trade practices laws." *Id.* at 13 n.20.

The district court in *Mazza*—which also involved claims brought under California's UCL, FAL, and CLRA—was also presented with a table of examples demonstrating variations in state law, which was used to support extensive briefing explaining the differences in state laws. *See* Brief in Opp'n to Class Certification at 8:6–13:8, *Mazza v. Am. Honda Motor Co., Inc.*, No. 07-cv-07857 (C.D. Cal. July 14, 2008), ECF Nos. 45, 45-2. However, in concluding that "at least some of the differences that [the defendant] identifies are material," the Ninth Circuit implicitly suggests that charts or tables may be considered when supported with adequate briefing. *See Mazza*, 666 F.3d at 591. At the very least, the Ninth Circuit does not outright remove the possibility of courts considering charts detailing purported differences in state consumer-protection laws. *See id.*

In one example presented in *Mazza*, the Ninth Circuit observed that California consumer-protection laws "have no scienter requirement, whereas many other states' consumer protection statutes do require scienter." *Mazza*, 666 F.3d at 591. The court identified scienter requirements for three states—Colorado, New Jersey, and Pennsylvania—as examples to highlight the differences between state consumer-

protection laws.  *See id.*  Interestingly, the three state laws identified by the Ninth Circuit were not explicitly discussed by the defendant in its opposition brief in the district court; in fact, scienter is not discussed anywhere in the brief.  *See* Brief in Opp'n to Class Certification at 8:6–13:8, *Mazza*, No. 07-cv-07857 (C.D. Cal. July 14, 2008), ECF Nos. 45, 45-2.  Rather, scienter is almost exclusively mentioned in the table included in support of the defendant's opposition.  *Id.*  That fact suggests that the Ninth Circuit believed the district court was presented with adequate briefing and support to conclude that there were material differences between state consumer-protection laws.  *See Mazza*, 666 F.3d at 591.

Between the spectrum of possibilities ranging from *POM I*'s chart-only presentation to *Mazza*'s extensive briefing coupled with a table, this case falls somewhere between the two.  Upon reviewing the *POM I* chart, it is worth noting that the *POM I* chart is strikingly similar to the one included in this case.  *See* Exhibit 21, *POM I*, No. 10-ml-02199 (C.D. Cal. June 25, 2012), ECF No. 92-3.  But unlike *POM I*, Defendants' opposition brief is not completely devoid of any explanation of the differences between California and other states' consumer-protection laws. (*See* Defs.' Opp'n 16:5–24.)  Referencing their chart, Defendants provide several, albeit brief, examples of how California's consumer-protection laws are materially different from other states' laws.  (*Id.*)  A few examples that Defendants provide include: (1) "California's UCL, FAL, and CLRA require that a plaintiff has suffered injury as a result of defendant's unlawful conduct, other states do not"; (2) "[s]tates' consumer protection statutes also vary to the extent scienter is a required element and whether reliance is required"; (3) "statute of limitations vary significantly from one year to ten years"; and (4) "[s]ome states do not permit class actions under their consumer protection laws." (*Id.*)  Each example provided also cites the Yourtz Declaration and the included charts.

Even though Defendants provide more briefing on the material differences between state laws than the defendant in *POM I*, they do not provide the same level of

extensive briefing that the defendant in *Mazza* did on the same subject.  In *Mazza*, the defendant explained in great detail the differences between state laws in its briefing to the district court.  *See* Brief in Opp'n to Class Certification at 8:6–13:8, *Mazza*, No. 07-cv-07857 (C.D. Cal. July 14, 2008), ECF Nos. 45, 45-2.  Comparatively, Defendants' explanation in its opposition brief here explaining the material differences in state consumer-protection laws is sparser. (*Cf.* Defs.' Opp'n 16:5–24.)  Nonetheless, though Defendants' charts may not be evidence, as Plaintiff contends, they are available to this Court to consider in light of the fact that Defendants provide some explanation to guide the Court in understanding that material differences may exist in the relevant state consumer-protection laws.

The two charts that Defendants provide are titled "Material Differences in State Consumer Protection and Deceptive Trade Practices" (Yourtz Decl. Ex. A) and "Variations in State Intentional / Negligent Misrepresentation Laws" (Yourtz Decl. Ex. B).  Both charts provide information regarding the laws of the remaining 49 states in the Union and the District of Columbia.  Citing *Mazza* and the Yourtz Declaration, Defendants generally contend that "[s]tates' consumer protection statutes also vary to the extent scienter is a required element and whether reliance is required." (Defs.' Opp'n 16:5–24.)

As previously mentioned, in *Mazza*, the Ninth Circuit observed that California consumer-protection laws "have no scienter requirement, whereas many other states' consumer protection statutes do require scienter."  666 F.3d at 591.  Defendants' chart includes two identical comparisons made in *Mazza*, Colorado and Pennsylvania, observing that Colorado's Consumer Protection Act requires that certain violations be made "knowingly" and Pennsylvania's Unfair Competition, Acts or Practices requires plaintiffs to show all elements of common-law fraud, including knowledge. (Yourtz Decl. Ex. A at 9, 43 (citing Colo. Rev. Stat. § 6-1-105(1)(e), (g), (u); *Debbs v. Chrysler Corp.*, 810 A.3d 137, 155 (Pa. Super. 2002)).)  The chart also indicates that Connecticut has no scienter requirement, but Alaska, Arizona, and Arkansas do. *See*

*Cheshire Mortg. Serv., Inc. v. Montes*, 223 Conn. 80, 106 (1992) ("[A] party need not prove an intent to deceive to prevail under CUTPA."); Alaska Stat. § 45.50.471(b)(12) (requiring intent); Ariz. Rev. Stat. § 44-1522(A) (requiring intent); Ark. Code § 4-88-107(a)(1) (knowingly).   This sample of state laws appears accurate based on the Court's independent verification.

With regard to reliance, *Mazza* observed that California "requires named class plaintiffs to demonstrate reliance, while some other states' consumer protection statutes do not," citing examples to laws in Florida, New Jersey, and New York.  666 F.3d at 591.  Indeed, states such as Connecticut, Delaware, Florida, and Montana, among others, do not require reliance. *See Izzarelli v. R.I Reynolds Tobacco Co.*, 117 F. Supp. 2d 167, 176 (D. Conn. 2000); *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983); *Davis v. Powertel, Inc.*, 776 So. 2d 971, 973 (Fla. Ct. App. 2000); *Durbin v. Ross*, 916 P.2d 758, 762 (Mont. 1996).

Differing statutes of limitations provide another material difference between states' consumer-protection laws.  The statute of limitations for California's consumer-protection laws range between three to four years.  *See* Cal. Civ. Code § 1783 (three years); Cal. Bus. & Prof. Code § 17208 (four years); Cal. Bus. & Prof. Code § 17500 (three years via Cal. Civ. Proc. Code § 338).  However, statutes of limitations from other states range anywhere from one to ten years.  *See* La. Rev. Stat. § 51:1409(E) (one year from date of allegedly deceptive act); Me. Rev. Stat. tit. 14, § 752 (six years from discovery of violation); R.I. Gen. Laws § 9-1-13 (ten years from time the violation took place).  Given that the class period begins in March 2005, almost six years prior to the commencement of this case, the differing statutes of limitations could have a material effect on a former student's rights to pursue certain claims against Defendants.

Similar material differences exist between the states' intentional and negligent misrepresentation laws.  For example, California requires knowledge of the falsity and intent to induce reliance for intentional and negligent misrepresentation.  *See Bowers*

*v. AT & T Mobility, LLC*, 196 Cal. App. 4th 1545, 1557 (2011); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Cambridge Integrated Servs. Grp., Inc.*, 171 Cal. App. 4th 35, 50 (2009). However, states such as New Jersey and Texas have no scienter requirement for negligent misrepresentation. *See Gaelick v. Conn. Gen. Life Ins. Co.*, No. 11-2464(SRC), 2011 WL 3794228, at *5 (D.N.J. Aug. 25, 2011) ("The elements of negligent misrepresentation are essentially the same as those of common law fraud except negligent misrepresentation does not require scienter."); *Angle v. Mortg. Elec. Registration Sys.*, No. 4:11CV352, 2011 WL 4370969, at *1 (E.D. Tex. Sept. 19, 2011) ("Unlike common law fraud, negligent misrepresentation does not require knowledge of the falsity or reckless disregard of the truth or falsity of the representation at the time it was made."). Material differences also exist between states' misrepresentation laws in their standards of proof as well as statutes of limitations. *See, e.g., Rosener v. Sears, Roebuck & Co.*, 110 Cal. App. 3d 740, 756 (1980) ("[F]raud need be proved by a 'preponderance of the evidence' rather than 'clear and convincing evidence.'"); *Daines v. Vincent*, 190 P.3d 1269, 1279 (Utah 2008) ("To prevail on a claim of fraudulent inducement, [the plaintiff] must present clear and convincing evidence . . . ."); *Jardine v. Brunswick Corp.*, 423 P.2d 659, 663 (Utah 1967) (also requiring clear and convincing evidence for negligent misrepresentation); *see also, e.g.,* 12 Vt. Stat. tit. 12, § 511 (six-year statute of limitations); Cal. Civ. Proc. Code § 338(d) (three-year statute of limitations); *Winn Fuel Serv., Inc. v. Booth*, 34 So. 3d 515, 519 (La. Ct. App. 2010) (one-year statute of limitations).

The Ninth Circuit pointed out that differences in scienter and reliance requirements between states' consumer-protection laws are "not trivial or wholly immaterial," explaining that "[i]n cases where a defendant acted without scienter, a scienter requirement will spell the difference between the success and failure of a claim," and "[i]n cases where a plaintiff did not rely on an alleged misrepresentation, the reliance requirement will spell the difference between the success and failure of the claim." *Mazza*, 666 F.3d at 591. The court continued that "[c]onsumer protection laws

are a creature of the state in which they are fashioned," and "[t]hey may impose or not impose liability depending on policy choices made by state legislatures or, if legislators left a gap or ambiguity, by state supreme courts." *Id.* This reasoning undoubtedly also applies to the consumer-protection laws—California's UCL, FAL, and CLRA—compared in this case. The same can also be said for intentional and negligent misrepresentation laws, many of which developed through states' common law.

Upon reviewing the relevant state laws, it is apparent to this Court that at least some material differences exist between states' consumer-protection and misrepresentation laws.[13] The Court would normally proceed to the test's second step, determining whether a true conflict exists, but Plaintiff appears to concede that point. Consequently, the Court proceeds to the test's third step.

### 2. Which State Interest Is Most Impaired

Plaintiff argues that Defendants fail to meet their burden of showing that the interests of other states outweigh California's interest because California is the "place of the wrong." (Pl.'s Reply 5:2–20.) She elaborates by explaining that all class members, herself included, "were exposed to Defendants' misrepresentations, omissions, and high-pressure recruiting tactics *solely* via Defendants' websites and telephone calls with [enrollment advisors][,]" with all of this conduct taking place in San Diego, where Bridgepoint is headquartered, the enrollment advisors are located, and the advertising and marketing operations are maintained. (*Id.* (emphasis in original).)

//

---

[13] Relying on *POM I* and *Forcellati v. Hyland's, Inc.*, 876 F. Supp. 2d 1155, 1161 (C.D. Cal. 2012), Plaintiff suggests that the first step of the governmental-interest test is a fact-intensive analysis. (Pl.'s Reply 4:19–21.) However, neither case requires rigorous application of the facts of the case in the conflict-of-laws step of the governmental-interest test. In fact, the Ninth Circuit in *Mazza* strictly compares requirements imposed by certain state laws without any reference to the facts of the case. *See Mazza*, 666 F.3d 590-91. As a result, the Court rejects Plaintiff's suggested analytical framework for the conflict-of-laws step of the governmental-interest test.

*Mazza* recognized that "California considers the 'place of the wrong' to be the state where the last event necessary to make the actor liable occurred." 666 F.3d at 593-94 (citing *McCann*, 48 Cal. 4th at 94 n.12; *Zinn v. Ex-Cell-O Corp.*, 148 Cal. App. 2d 56, 80 n.6 (1957)). But when the liable conduct occurred, for example, over the telephone where there are two people speaking at fixed points in two different states, it is not as clear where the "place of the wrong" is. Plaintiff suggests that the "place of the wrong" is where the speaker makes, for example, the fraudulent representations over the telephone.

In *Does v. Geller*, 533 F. Supp. 2d 996, 1004 (N.D. Cal. 2008), the court faced a situation where a misrepresentation occurred over long-distance communication. The *Geller* Court opined that "[f]ollowing common law tort principles, the court might be inclined to rule that the situs of the act is the place where a fax or email was received, not sent. But the best support for that statement is found not in any recent, binding precedent but rather in the First Restatement of Conflict of Laws, published in 1934." *Gellar*, 533 F. Supp. 2d at 1004.

Like the court in *Gellar*, this Court also faces determining the place of the wrong with alleged wrongful conduct committed over long-distance communication without any recent, binding precedent. To start, the First Restatement of Conflict of Laws does indeed define the "place of wrong" as "in the state where the last event necessary to make an actor liable for an alleged tort takes place." *See Zinn*, 148 Cal. App. 2d at 80 n.6 (citing Restatement (First) of Conflict of Laws § 377 (1934)). And Note 4 of the Restatement further elaborates that "[w]hen a person sustains loss by fraud, the place of wrong is where the loss is sustained, not where fraudulent representations are made."[14] Given that *Mazza*, *Zinn*, and to some extent *Gellar* have

_____

[14] Accompanying the Restatement's Note 4 is the following illustrations: (1) "A, in state X, makes false misrepresentations by letter to B in Y as a result of which B sends certain chattels from Y to A, in X. A keeps the chattels. The place of the wrong is in state Y where B parted with the chattels"; and (2) "A, in state X, owns shares in the M company. B, in state Y, fraudulently persuades A not to sell the shares. The value of the shares falls. The place of wrong is X."

accepted the Restatement's definition for the "place of wrong," and the Restatement being the Court's best available guidance, it is reasonable to accept the Restatement's Note 4, setting the place of wrong where the loss is sustained in fraudulent-misrepresentation cases.

Here, Plaintiff alleges that misrepresentations and omissions to herself and other class members all occurred over long-distance communications through websites and telephone calls with Defendants' enrollment advisors.  (Pl.'s Reply 5:2–14.)  But applying the Restatement's principle articulated in Note 4, it is not where the communications originate—in this case, San Diego, California—but rather where Plaintiff or other potential class members sustained their loss—which is likely the state where the former students are domiciled at the time they signed up for enrollment.  Focusing on Plaintiff's circumstances, the place of wrong would be in Indiana, from where Plaintiff presumably communicated with Defendants.

More importantly, there is evidence before this Court that almost 90% of potential class members resided outside of California when they enrolled.  (Morrison Decl. ¶ 4.)  This fact is important because "courts should not attempt to apply the laws of one state to behaviors that occurred in other jurisdictions."  *See Mazza*, 666 F.3d at 593 (internal quotation marks omitted).  With almost 90% of potential class members having enrolled outside of California, imposing California law on those members would undoubtedly impair the foreign states' interests.  *See id.*  California law also recognizes as much given that it emphasizes that "the place of the wrong has the predominant interest."  *See Hernandez v. Burger*, 102 Cal. App. 3d 795, 802 (1980).  And here, not to belabor the point, but almost 90% of the wrongs alleged occurred outside of California.  *See id.*

Following the analytic framework emphasized in *Mazza*, this Court concludes that each potential class member's consumer-protection and misrepresentation claims should be governed by the laws of the jurisdiction in which the loss was sustained.  *See Zinn*, 148 Cal. App. 2d at 80 n.6; *see also* Restatement (First) of Conflict of Laws §

377 (1934).  Under the facts and circumstances of this case, applying California law for a potential nationwide class is inappropriate.  *See Wash. Mut. Bank*, 24 Cal. 4th at 921.

## IV.   CONCLUSION & ORDER

It should be emphasized that this order does not make any determination regarding the merits of potential individual claims by Plaintiff or any other former student, or even the possibility of pursing a class action on a smaller scale against Defendants.  The student complaints attached to Plaintiff's class-certification motion describe a poorly run educational institution eliciting much doubt as to whether Defendants do indeed prioritize their students' best interests.  The vast sums of money produced from students is particularly alarming given the circumstances described.

But ultimately, Plaintiff fails to satisfy ascertainability requirements for the proposed class as currently constructed and Defendants successfully carry their burden to demonstrate that this action is not appropriate for nationwide class treatment under California law under Rule 23.

In light of the foregoing, the Court **GRANTS** Defendants' motion for sanctions and strikes the Ferguson Declaration.  The Court also **DENIES** Plaintiff's motion for class certification.

**IT IS SO ORDERED.**

**DATED: March 26, 2015**

Cynthia Bashant
**Hon. Cynthia Bashant**
**United States District Judge**